FRED WILKINS, ADM'R *vs.* WALDO LUMBER COMPANY.

Franklin.        Opinion January 9, 1931.

*Cyrus N. Blanchard,*
*Frank W. Butler,* for plaintiff.
*George F. Eaton,* for defendant.

SITTING: PATTANGALL, C. J., DUNN, STURGIS, BARNES, FARRING-TON, THAXTER, JJ.

STURGIS, J.   Action of debt on a contract under seal signed on behalf of the defendant by its salesman. Plea of general issue with brief statement denying that the execution of the contract was authorized. The case comes to this court on the defendant's motion and exceptions.

MOTION:

The following are the important material facts which the evidence tends to prove and from which the rights of the parties must be determined. Other facts disclosed, if pertinent to the issue, are cumulative only.

In the late summer or early fall of 1928, Daniel F. Adams, a salesman for the Waldo Lumber Company of Bangor, Maine, began negotiations for the purchase by the Company of a lot of sawed hard wood lumber then on the sticks at Temple, Maine, and for sale by the plaintiff as administrator of the estate of George W. Staples.

Mr. Adams examined the lumber and, upon an interview with the administrator, obtained a price of $15.00 per M on the sticks. He also arranged with one F. C. Metcalf of West Farmington to haul and mill the lumber if it was purchased, and incidentally learned that the Gem Crib & Cradle Co. of Gardner, Mass., was in the market for finished hard wood lumber.

Reporting these facts to Irving G. Stetson, the general manager of the Waldo Lumber Co., Mr. Adams was directed to obtain an order from the Gem Crib & Cradle Co., if possible, and to arrange with Mr. Metcalf for hauling and tallying the lumber at a price of $5.50 per M and for milling it at $12.00 per M.

Mr. Adams obtained an order from the Gem Crib & Cradle Co. for 180 M feet of hard wood squares with the stipulation that "above order may be increased to take care of lot at Temple, Maine," went to Wilton, directed Mr. Metcalf to begin hauling and milling the lumber, and, on November 24, 1928, signing for the Waldo Lumber Co. as agent, joined the plaintiff in the execution of a written contract, under seal, for the sale to and purchase by

the Waldo Lumber Co. of all sawed lumber belonging to the Staples Estate then on the sticks in Temple. The price fixed for the lumber was $15.00 per M on the sticks and the contract was signed by Mr. Adams subject to confirmation by the Waldo Lumber Co.

Within a few days, the order of the Cradle Company and the contract made by Mr. Adams and Mr. Wilkins was submitted to Mr. Stetson, the general manager, for confirmation. On November 27, 1928, Mr. Metcalf, pursuant to the orders given him by Mr. Adams, began hauling the Staples lumber from the sticks to his mill, tallying it as it came in, and milling it to the specifications of the Crib & Cradle Company order.

It appears, however, that Mr. Stetson did not formally confirm the lumber contract. Although he had directed Mr. Adams to get the order from the Cradle Company and undoubtedly knew that the lumber was being moved to the Metcalf mill on Mr. Adams' orders, he withheld confirmation while he attempted to work out a more advantageous and profitable arrangement. He wrote the Crib & Cradle Company asking for a modification of its order. On December 6, 1928, he wrote the plaintiff asking for more detailed information than appeared in the contract, noting lack of confirmation but not repudiating the instrument executed by Mr. Adams. On the same day he wrote Mr. Adams expressing a doubt as to the profits to be made on filling the Cradle Company order, closing his letter with this paragraph:

"We wish that you would figure this over in view of the requirements stated in this letter, check up on the thickness of the plank and talk it over with Mr. Metcalf. It would surely be better to back out now, which we *can* do, but naturally do not want to do if there is a reasonable chance of going through with a whole skin."

Relying upon and reiterating the fact that the contract signed by Mr. Adams had not been confirmed, he attempted to get the plaintiff to sign a new contract of a modified tenor and more advantageous to the Lumber Company. He sought and obtained an agreement from Mr. Metcalf to mill the lumber at a reduced cost. He endeavored to get Mr. Metcalf to take over the purchase from

the plaintiff and the order of the Crib Company, and finally on January 2, 1929, wrote the plaintiff repudiating the contract signed by Mr. Adams with the statement that the plaintiff must look to Mr. Metcalf, the mill man, for his pay for the lumber belonging to the Staples Estate. The plaintiff did not reply nor did he accept Mr. Metcalf as paymaster.

All this time, upon the authority of the orders originally given by Mr. Adams and with the knowledge of the general manager of the Lumber Company, Mr. Metcalf had been hauling the lumber from the lot where it lay, was milling it upon the specifications of the Cradle Company order, and had begun shipments.

In December, the exact date not appearing, the Lumber Company arranged to finance the transaction through the People's National Bank of Farmington, Maine, and although Mr. Stetson called his remittances advances, checks therefor payable to Mr. Metcalf's order were turned over to him from time to time to cover his hauling and milling charges. Through January, February, and March, 1929, Mr. Metcalf, with Mr. Stetson's knowledge, kept on hauling and milling or piling up the lumber, and during the same period four more cars were shipped to the Crib & Cradle Company on orders sent to Metcalf from the Waldo Lumber Co., which billed the cars direct from its Bangor office and made collections in due course. April 9, 1929, Mr. Stetson ordered Metcalf to stop milling on this order.

Mr. Adams was at all times in touch with the milling operations. He testifies that he was at the Metcalf mill frequently, checking the milling with specifications of the Crib & Cradle Company order. In January, he was there a week sorting the lumber as the result of a complaint as to the quality of the squares already shipped. And it must be inferred that his contact with Mr. Metcalf and the milling was fully known to Mr. Stetson, who writes Mr. Metcalf on January 14, 1929, as follows:

"It is not fair to us to expect that Mr. Adams give any more of his time to this matter. He has done practically no business since this hard wood proposition started nearly eight weeks ago, and it should not be necessary to give it any further time or attention whatever. We can not have him doing so."

Until the snow left in the spring, Mr. Metcalf kept on hauling the plaintiff's lumber from Temple to the mill, and, when on April 9, 1929, the Lumber Company directed him to stop milling, 324,969 feet had been hauled, leaving 20,000 feet still at Temple.

The lumber having been attached under a lien claim, Mr. Stetson demanded a discharge of the attachment by the plaintiff, received it and caused it to be recorded. Reassured by the local Register of Deeds that the lumber was not encumbered by a mortgage on the land, he nevertheless prepared a bond against such title defect and sent it, together with a check covering the lumber then hauled as reported by Metcalf, to the People's National Bank, for delivery to the plaintiff. By reference to correspondence, it would appear that this check went forward on March 26, 1929, and, from the testimony of the bank officials, it is disclosed that, although the plaintiff came to the bank and offered to sign the receipt and bond, payment of the check had been stopped by wire from Mr. Stetson almost immediately after it reached the bank.

The plaintiff's contention is that he at all times insisted that his rights were measured by the contract which he had signed on November 24, 1928, and that he never accepted Metcalf as his paymaster or standing in any contractual relation with him. He points out that, although through December, 1928, the manager of the defendant Company held up formal confirmation of the contract the plaintiff had signed, and questioned the authority of Mr. Adams to make it, nevertheless, from November 27, 1928, the lumber was being hauled from the land of the plaintiff's intestate and milled at West Farmington, upon orders authorized by and with the full knowledge of the manager of the defendant Company. And he says that, when the new contracts were sent to be substituted for the original, a substantial part of the lumber had already been moved, more than 196,000 feet before December 15, 1928, as on that date billed to the Lumber Company by Metcalf, and as much more as the interim to December 29, 1929, permitted, so that it may well be assumed that a substantial part of the lumber was at the mill, and the plaintiff's statements were not gross exaggeration when he wrote:

"Gentlemen:

I regret that you do not feel that the first contract is sufficient to cover our transaction. I feel that it is and can see no reason why, after the lumber has been practically all moved from Temple to the mill, I should sign another contract and I am therefore again returning them unsigned."

The defendant's claim is that, because of the failure of its manager to confirm the contract in controversy, including his notifications to the plaintiff to that effect, it is not bound to pay the plaintiff for the lumber taken from his intestate's property. Its position is that the plaintiff must look for his pay to Metcalf, who milled the lumber. It even asserts through the testimony of its manager and its bookkeeping that it only sold the lumber on commission for Metcalf.

From the evidence, including the somewhat disconnected and confusing correspondence introduced as exhibits, the jury found for the plaintiff for the full amount of lumber covered by the contract with interest from the date of demand by the plaintiff's attorney. We can not find in the record evidence which justifies a conviction that the verdict was manifestly wrong.

The evidence warranted a finding, we think, that, with full knowledge of all material facts, the defendant Company through its general manager took and retained a part at least of the benefits of the unauthorized contract which its salesman, Mr. Adams, made. It directed and acquiesced in the hauling of the lumber from the Staples lot to the Metcalf mill and the finishing of enough of it to fill the order of the Gem Crib & Cradle Company until five cars had been shipped. It must be held in law to have impliedly ratified the transaction in part at least, and that binds it for the entirety. *Bryant* v. *Moore*, 26 Me., 84; *Goss* v. *Kilby*, 112 Me., 323, 328; *Gilman* v. *Carriage Co.*, 127 Me., 91; *Drug Co.* v. *Lyneman*, 10 Colo. Ap., 249; *Sartwell* v. *Frost*, 122 Mass., 184; *Russell* v. *The Machine Co.*, 17 N. D., 248; *Box Co.* v. *Winter*, 144 N. Y. S., 269; Mechem on Agency, Sec. 148; 2 C. J., 501; 21 R. C. L., 932.

Even though the manager of this defendant Lumber Company did not actually intend to bind his corporation, his acts and state-

ments, rather than his professions, must determine the question of ratification.

In *Smith* v. *Fletcher*, 75 Minn., 189, 193, it is said:

"Ratification, like authorization, is generally the creature of intent; but that intent may often be presumed by the law from the conduct of the party, and that presumption may be conclusive even against the actual intention of the party where his conduct has been such that it would be inequitable to others to permit him to assert that he had not ratified the unauthorized act of his agent."

In Mechem on Agency, Secs. 146 and 148, we read:

"Ratification, like authorization of which it is the equivalent, is generally the creature of intent, but that intent may often be presumed by the law in cases where the principal, as a matter of fact, either had no express intent at all, or had an express intent not to ratify."

"If the principal has knowingly appropriated and enjoyed the fruits and benefits of an agent's act, he will not afterwards be heard to say that the act was unauthorized. One who voluntarily accepts the proceeds of an act done by one assuming, though without authority, to be his agent, ratifies his act and takes it as his own, with all its burdens as well as all its benefits. He may not take the benefits and reject the burdens, but he must either accept them or reject them as a whole."

And in *Advertising Co.* v. *Wanamaker & Brown*, 115 Mo. Ap., 270, 280, that Court says:

"The real ground on which the principal is held liable under such circumstances is that of estoppel; though it is often said that the principal ratified what was done by his agent by remaining silent.* In its genuine sense, ratification depends on intention. It is the voluntary assumption, on full knowledge, of an unauthorized act or agreement by the party in whose behalf it was done or made. The intention to ratify may be manifested by express words or by conduct. Either may es-

tablish that the principal elected to adopt the act or agree-ment as his own; and the election once made, with knowledge of the facts, becomes irrevocable. Besides a true ratification intentionally made, the law recognizes a constructive one where none was intended. The latter sort of ratification is a legal presumption raised against the principal because he has be-haved in such a way that the party dealt with by the agent would be injured if the transaction was repudiated. It is really an equitable estoppel and is regulated by the law of estop-pel. * * *"

The doctrine of estoppel based upon the acceptance of the bene-fits of a contract is stated in *Belfast* v. *The Belfast Water Co.*, 115 Me., 234, 239, in these words:

"When a party has accepted the benefits of a contract, not *contra bonos mores*, he should not be permitted to question the validity of it,* he is estopped."

One more branch of the rule of ratification needs mention. Where the principal receives the benefits of an unauthorized act of his agent, when he is apprised of the facts, if he has suffered no preju-dice and can make restitution, he must elect whether to ratify or disaffirm, and if he decides not to ratify, he must return the fruits of the unauthorized act within a reasonable time. If thereafter he retains, uses or disposes of what he has received, he will be held to have ratified the act of his agent unless restoration would be of no practical value to the other party. *Crooker* v. *Appleton*, 25 Me., 131; *Furniture Co.* v. *Baptist Inst.*, 113 Ga., 289; *Bank* v. *Bank*, 49 Neb., 379, 381; *Beecher* v. *Grand Trunk R. Co.*, 43 Vt., 133; *Andrews* v. *Robertson*, 111 Wis., 334; 2 C. J., 496. It is held that this rule applies if the principal retains the benefits of the con-tract notwithstanding his denial of the agent's authority or his express disapproval or repudiation of the agent's acts. *Perkins* v. *Boothby*, 71 Me., 91, 94; *Pike* v. *Douglass Co.*, 28 Ark., 59; *Furniture Co.* v. *Inst.*, supra; *Wright* v. *M. E. Church*, 72 Minn., 78; *Hatch* v. *Taylor*, 10 N. H., 538, 553, et seq.

Under the rules stated, the verdict must stand. If the distinc-tions of the law bar a finding of ratification in the strict sense of

that term, the doctrine of estoppel denies the defendant the right of now repudiating the contract with the plaintiff.

EXCEPTIONS:

The defendant objected to the introduction of a letter from the manager of the defendant Lumber Company to F. C. Metcalf, dated November 19, 1928, referring to and accompanied by an order for a car load of the lumber here involved to be shipped to N. L. Page & Son Co. of Auburn, Maine. The ground of objection was that the letter antedated the contract in suit. It was admitted to show that the manager "acquiesced in the making of the contract." This was not error. The order inclosed with the letter was foreign to the later appropriation of the lumber to the Gem Crib & Cradle Company order, but the general text of the letter indicated knowledge and acquiescence on the part of the manager in the preliminary negotiations for the contract and sheds light upon his subsequent acts and declarations. The letter is not outside the rule of relevancy, nor was it prejudicial.

The contract made by the plaintiff and Mr. Adams was properly admitted. It was within the discretion of the presiding Justice to determine the order in which evidence should be introduced and evidence brought in later made the necessary connection.

To justify the failure of the manager of the defendant Company to communicate with the plaintiff from November 24, 1928, when the contract in suit was executed, until December 6, following, counsel for the defendant inquired:

"Q. Whether or not you interviewed men familiar with the manufacturing of lumber there in Bangor?"

The only proper answer to this question was "Yes!" or "No!" With no prior or subsequent testimony enlarging the value of such answer, no prejudice results from its exclusion. If there had been, it was removed by the introduction of the same evidence in letters between the parties.

*Motion overruled.*
*Exceptions overruled.*