2001 ME 116

## QAD INVESTORS, INC.

v.

## Laurence KELLY

Supreme Judicial Court of Maine.

Submitted on Briefs May 29, 2001.

Decided July 20, 2001.

Paul F. Macri, Julian J. Sweet, Berman & Simmons, P.A., Lewiston, ME, for plaintiff.

John S. Campbell, Campbell & Assoc., P.A., Portland, ME, for defendant.

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, and CALKINS, JJ.

DANA, J.

[¶ 1] Laurence Kelly appeals from a judgment of the Superior Court (Cumberland County, *Warren*, *J.*) in favor of QAD Investors, Inc. on its claim against Kelly for failure to fulfill his obligations pursuant to a promissory note. Kelly contends that the court erred in finding him liable on a note that he did not sign, and was not signed or ratified on behalf of himself or the partnership he formed with Stephen MacKenzie; in awarding attorney fees to QAD pursuant to the note; and in awarding attorney fees in excess of QAD's costs of collection. We disagree and affirm.

## BACKGROUND

[¶ 2] The court found the following facts. In 1993, Kelly entered into a joint venture with MacKenzie to purchase a parking lot. Kelly and MacKenzie were two of the three members of a partnership that owned the Brian Boru Public House in Portland. Kelly and MacKenzie obtained an option to purchase the lot for $280,000, paying $5000 per month to maintain the option while they raised the money to purchase the lot. While Kelly and MacKenzie were searching for investors, MacKenzie approached Russell Glidden, the principal of QAD, and provided him with a copy of Kelly's personal financial statement. Kelly, MacKenzie, and Glidden met together repeatedly thereafter. At the meetings, Kelly did not object to MacKenzie's characterization of him as a joint venturer in the project. By the end of the second meeting, Glidden had committed QAD to providing $20,000 to the venture.

[¶ 3] Glidden delivered the check, after which MacKenzie gave Glidden a written receipt stating that the money procured a one-third interest in the parking lot. The receipt also provided that the $20,000 would be paid back pursuant to a note that Glidden would hold. The money was deposited into a bank account under Kelly's exclusive control.

[¶ 4] The promissory note was prepared soon thereafter, providing, in relevant part:

FOR VALUE RECEIVED, the undersigned, STEPHEN H. MAC-KENZIE and LAURENCE KELLY, promise to pay to QAD INVESTORS the principal sum of $20,000.00 at 14% per annum, payable as follows:

I.   Payments of principal and interest in the amount of $960.26 shall be paid monthly, commencing on January 15, 1994, until the principal and accrued interest are fully paid;

. . . .

III.  The unpaid balance of principal and accrued interest shall be paid in full upon the sale or transfer of all or any part of the real estate securing this note, or an interest therein, without the Holder's prior consent. . . .

. . . .

The undersigned and all other parties liable hereon, whether principals, endorser or otherwise, hereby jointly and severally waive presentment for payment, demand of nonpayment, and notice of protest of this note.

This note is secured by a pledge of any and all interests held by Laurence Kelly and Stephen MacKenzie in the parking lot located at $\frac{57}{59}$ Center Street, Portland, Maine, and is to be considered joint and several as to the makers.

The note has lines for the signatures of Kelly and MacKenzie, but only Mac-Kenzie's line contains a witnessed signature; Kelly's line is blank.

[¶ 5] MacKenzie made the first two or three payments, but thereafter Kelly made all payments out of the account over which Kelly exercised exclusive control. Kelly communicated to QAD in the summer of 1994 that payments would not be kept current because the summer months were slow. QAD received no payments from May 1994 to September 1994. Kelly, without MacKenzie, met with Glidden, Fergus O'Reilly (the third owner of Brian Boru), and Justin O'Reilly (Fergus's brother), to discuss the payment of the note. Kelly delivered one month's payment after the meeting. Glidden wrote a letter to Kelly indicating that he felt more comfortable about the payment schedule after the meeting and made clear that he was looking to Kelly for future payments.

[¶ 6] Kelly made another payment in October 1994, which prompted Glidden to write Kelly a letter reminding him that he was four months in arrears and again making it clear that he was looking to Kelly for payment. Kelly delivered another payment in November, followed by another letter from Glidden discussing the arrearage. At no time during the correspondence did Kelly suggest to QAD that he was not obligated by the note.

[¶ 7] In November 1994, MacKenzie agreed to transfer his interest in the lot to Fergus and Justin O'Reilly. Nobody informed QAD of MacKenzie's agreement with the O'Reillys at that time. MacKenzie had been "eased out of" his partnership in Brian Boru and the joint venture in the parking lot. Kelly continued to make payments.

[¶ 8] In February 1995, Kelly requested a copy of the note, which Glidden sent to him with another letter concerning the arrearage. Glidden indicated in his letter that he understood that an interest in the parking lot was being sold, and asked if arrangements had been made to pay off the note. Although aware of the note, Kelly had not seen the note before February 1995; when he did see it, he consulted with an attorney. Kelly did not inform Glidden that he believed he was not responsible for the note, but instead made one more payment that month, requesting that Glidden not cash the check immediately. Kelly was concerned that Glidden would disrupt a transaction that would transfer the ownership of the parking lot. The transaction closed and no further payments were made.

[¶ 9] In May of 1995, Glidden met with Kelly and the O'Reillys to discuss restructuring the debt. Again, Kelly did not indicate that he believed he was not obligated on the note.

[¶ 10] QAD filed a complaint against MacKenzie and Kelly on January 9, 1997, seeking payment due pursuant to the note, in addition to interest, costs, and attorney fees. Kelly filed his answer alleging, by way of affirmative defense, that (1) he never represented verbally or in writing that he agreed to be liable on the note MacKenzie signed, (2) he had never seen or signed the note, and (3) he never autho-

rized MacKenzie to sign on his behalf. MacKenzie was discharged in bankruptcy. After a bench trial on April 27, 2000, the court concluded that Kelly was jointly liable on the note as a member of the joint venture, which is a partnership for a limited purpose. The court reasoned that Kelly authorized the execution of the note on behalf of the partnership, and that even if the partnership had not authorized the note, it ratified the loan based on Kelly's and MacKenzie's subsequent acts. The court found Kelly liable for half the indebtedness of the partnership, plus interest, totaling $11,240.80.[1] The court also awarded attorney fees to QAD in the amount averred by attorney Julian Sweet in his affidavit, $8717.75.

### DISCUSSION

A. Kelly's Liability

[¶ 11] Kelly contends that he cannot be personally liable on the note because he did not sign it in compliance with the Uniform Commercial Code, 11 M.R.S.A. § 3–1401 to –1402 (1995), and did not authorize MacKenzie to sign the note on his behalf. According to Kelly, the note was not binding on the partnership because it was not signed in the partnership name, nor was it executed in the ordinary course of business as required by the Uniform Partnership Act, 31 M.R.S.A. §§ 288 and 289 (1996). According to Kelly, he did not ratify the note either, because the note was not executed on his account, he conferred with an attorney to confirm that he was not liable on the note when he discovered there was a signature line for him on it, and his actions did not constitute an affirmance of MacKenzie's execution of the note on his behalf.

[¶ 12] According to QAD, the plain language of the note indicates that the parties understood that Kelly was to be bound as a partner because a signature line is present on the note and the note pledges as collateral an interest in the property for which the partnership was formed. QAD contends, in the alternative, that MacKenzie had apparent authority to act for Kelly both personally and as a partner. Finally, it contends that Kelly ratified the note by making payments on it and failing to communicate that he did not believe he was liable.

[¶ 13] A promissory note is a contract. See Briggs v. Briggs, 1998 ME 120, ¶ 6, 711 A.2d 1286, 1288. "Whether a contract is ambiguous is a question of law for the Court. Resolution of any ambiguity is a question of fact for the trial court." Schindler v. Nilsen, 2001 ME 58, ¶ 15, 770 A.2d 638, 643 (citation omitted). If a contract is unambiguous, the interpretation of that contract is a question of law. Acadia Ins. Co. v. Buck Constr. Co., 2000 ME 154, ¶ 8, 756 A.2d 515, 517. We review questions of fact for clear error and questions of law de novo. Forrest Assocs. v. Passamaquoddy Tribe, 2000 ME 195, ¶ 9, 760 A.2d 1041, 1044; Blanchard v. Sawyer, 2001 ME 18, ¶ 5, 769 A.2d 841, 843.

[¶ 14] We disagree with QAD that the language of the note unambiguously establishes Kelly's personal liability on the note. The blank signature line and the security of the note against partnership interests are inadequate to establish Kelly's personal liability; instead, they create an ambiguity. We therefore review the court's resolution of that ambiguity for clear error. Forrest Assocs., ¶ 9, 760 A.2d at 1044.

[¶ 15] Kelly does not contest the existence of a partnership between himself and MacKenzie. The Uniform Partnership Act provides, in relevant part:

---

1. QAD did not cross appeal.

Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority.

An act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners.

31 M.R.S.A. § 289. "As is made clear by the use of the adverb apparently, the partner need not be engaged in the actual business of the partnership; his acts need only be apparently within the scope of the partnership business." *Dayton Sec. Assocs. v. Morgan Guar. Trust Co. of New York (In re Securities Group)*, 926 F.2d 1051, 1054 (11th Cir.1991) (internal quotation marks omitted). The party seeking to enforce the agreement may "rely on any apparent authority only to the extent that it was being exercised in pursuance of partnership business 'in the usual way.'" *Luddington v. Bodenvest Ltd.*, 855 P.2d 204, 210 (Utah 1993).

[¶ 16] "A contract does not need to be signed by all partners or even mention the name of the partnership in order to bind the partners." *Barnes v. McLendon*, 128 Wash.2d 563, 910 P.2d 469, 474 (1996). Moreover, the note need not be in the partnership name if the partnership has no name. *See First State Bank of Riesel v. Dyer*, 248 S.W.2d 785, 788 (Tex.Civ.App. 1952).

[¶ 17] Kelly also cites the UCC, which provides instruction on the requirement of a signature on a negotiable instrument.

(1) A person is not liable on an instrument unless:

(a) The person signed the instrument; or

(b) The person is *represented by an agent* or representative who signed the instrument and the signature is binding on the represented person under Section 3–1402.

11 M.R.S.A. § 3–1401 (emphasis added). Section 3–1402 provides that:

(1) If a person acting, or purporting to act, as a representative signs an instrument by signing either the name of the represented person or the name of the signer, the represented person is bound by the signature to the same extent the represented person would be bound if the signature were on a simple contract. If the represented person is bound, the signature of the representative is the authorized signature of the represented person and the represented person is liable on the instrument, whether or not identified in the instrument.

*Id.* § 3–1402.

[¶ 18] The law of partnership and the law of negotiable instruments direct us to determine whether MacKenzie had authority to sign the note for the partnership or for Kelly personally. "Whether an agency relationship exists is generally a question of fact that we review for clear error." *Steelstone Indus., Inc. v. North Ridge Ltd. P'ship*, 1999 ME 132, ¶ 12, 735 A.2d 980, 983. "The burden of proof as to the partner's authority is on the party seeking to enforce the transaction." *Luddington*, 855 P.2d at 207. Likewise, the party seeking to enforce bears the burden of proving that the transaction occurred in the usual way. *Burns*

*v. Gonzalez*, 439 S.W.2d 128, 132 (Tex.Civ. App.1969).

[¶ 19] "Apparent authority is authority which, though not actually granted, the principal knowingly permits the agent to exercise or which he holds him out as possessing. Apparent authority exists only when the *conduct of the principal* leads a third party to believe that a given party is [its] agent." *Steelstone Indus.*, ¶ 13, 735 A.2d at 983 (emphasis in original; internal quotation marks omitted): *see* RESTATEMENT (SECOND) OF AGENCY § 8 (1958). "[T]he third person must believe the agent to be authorized." RESTATEMENT (SECOND) OF AGENCY § 8 cmt. c.

[¶ 20] The court did not commit clear error in finding that MacKenzie's and Kelly's conduct would lead a reasonable third party to believe that MacKenzie was acting as the agent of the partnership and with the requisite authority. Kelly attended meetings with Glidden and MacKenzie during which they discussed the possibility of obtaining money from Glidden for the joint venture. MacKenzie gave Kelly's personal financial statement to Glidden before negotiating with him. The facts found by the court adequately support its legal conclusion that MacKenzie was authorized to bind the partnership.[2]

[¶ 21] Even if MacKenzie's apparent authority to bind the partnership was in doubt, Kelly's subsequent conduct ratified that authority. "For ratification of an agent's actions to occur, it is necessary that all material facts be known by the principal." *Perkins v. Philbrick*, 443 A.2d 73, 75 (Me.1982).

> When the principal receives the benefits of an unauthorized act of his agent, when he is apprised of the facts, if he

has suffered no prejudice and can make restitution, he must elect whether to ratify or disaffirm and if he decides not to ratify he must return the fruits of the unauthorized act within a reasonable time.

*Id.* "[R]atification of an unauthorized signature may be found from the retention of benefits *received in the transaction with knowledge* of the unauthorized signature." *Id.* (emphasis in original; internal quotation marks omitted).

[¶ 22] According to the RESTATEMENT (SECOND) OF AGENCY, "[r]atification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." RESTATEMENT (SECOND) OF AGENCY § 82. "Affirmance is either (a) a manifestation of an election by one on whose account an unauthorized act has been done to treat the act as authorized, or (b) conduct by him justifiable only if there were such an election." *Id.* § 83. "An affirmance of an unauthorized transaction can be inferred from a failure to repudiate it." *Id.* § 94.

[¶ 23] The court did not commit clear error in finding that, even if MacKenzie's execution of the note was unauthorized, Kelly's behavior following the execution of the note ratified MacKenzie's authority to sign the note. Kelly made payments in the precise amount specified by the note, he met with Glidden repeatedly to renegotiate the payment schedule, he failed to indicate at any time before the commencement of this suit that he did not believe the partnership was bound by the note, and he made a payment even after he knew that

---

**2.** We need not, therefore, address whether Kelly authorized MacKenzie to bind him personally.

his signature did not appear on the note. We affirm the judgment.

## B. Attorney Fees

[¶ 24] Kelly contends that he cannot be held liable for attorney fees on the note because the note provides only that "the undersigned" will be responsible for the costs of collection. In addition, he contends that QAD's cost of collection is the one-third contingent fee owed to attorney Sweet, not the affidavit of fees reported by Sweet, which lists his fees on an hourly basis.

[¶ 25] QAD contends that the note identifies Kelly as one of the undersigned. According to QAD, the court did not abuse its broad discretion to determine the amount of attorney fees.

[¶ 26] "We afford the trial court wide discretion in determining whether or not to award attorney fees, and we review the trial court's factual conclusions for clear error." *Pine Ridge Realty, Inc. v. Mass. Bay Ins. Co.*, 2000 ME 100, ¶ 29, 752 A.2d 595, 602 (citations omitted). Whether the fee is fixed or contingent is but one of twelve factors for the court to consider in awarding reasonable attorney fees. *See Poussard v. Commercial Credit Plan, Inc. of Lewiston*, 479 A.2d 881, 884 (Me.1984).

[¶ 27] Sweet's affidavit states that the contingent fee agreement provided that his firm "would receive reasonable compensation on a contingent basis *in the event of settlement.*" (Emphasis added.) Sweet avers that he "further explained ... that the promissory note ... provided for collection of attorney's fees in the event of enforcement, and that if the case proceeded to trial, [he] would seek an award of attorney's fees." Sweet communicated to Kelly by letter that he and QAD had "a standard Rule 8 contingent fee agreement...." *See* M. Bar R. 8.

[¶ 28] Because "the undersigned" is the partnership, Kelly is bound as a partner by the clause in the note providing for QAD to recover the costs of collection. The court was entitled to believe Sweet and award the fees calculated by Sweet at his hourly rate because the case did not settle, but instead went to judgment after trial.

The entry is:

Judgment affirmed.