MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2016 ME 132
Docket:        Cum-15-559
Argued:        May 3, 2016
Decided:       August 16, 2016

Panel:         ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

ESTATE OF BARBARA M. FROST

JABAR, J.

[¶1]  Nancy Gamash appeals from a summary judgment entered in the Cumberland County Probate Court (*Mazziotti, J.*) in a matter derivative to a will contest that she initiated regarding the estate of Barbara M. Frost.  She contends that the court erred in concluding that Bank of America, N.A., (BANA) holds a valid note and mortgage encumbering property of Frost's estate, and that the advances on BANA's mortgage are valid obligations of Frost's estate.  In the absence of a genuine dispute of material fact on the issue, we affirm the judgment entered in BANA's favor as to the validity of the note and mortgage.  With respect to the validity of certain mortgage advances, however, we vacate the judgment entered in favor of BANA and remand for the entry of a summary judgment in favor of Gamash.

## I. FACTUAL BACKGROUND

[¶2]  "Viewing the record in the light most favorable to the non-prevailing part[y], the summary judgment record contains the following facts, which are undisputed unless otherwise noted." *Remmes v. Mark Travel Corp.*, 2015 ME 63, ¶ 3, 116 A.3d 466 (citation omitted).

[¶3]  Frost, who was born in 1933, executed a will in March 2000, naming her half-sister, Gamash, as her sole beneficiary.  Frost's friend, Thomas Blair, began managing tenants, repairs, and renovations at Frost's multi-unit property and residence in Old Orchard Beach (the property) at some point in the early 2000s.  On September 9, 2005, Frost executed a durable financial power of attorney (the POA) appointing Blair as her agent.

[¶4]  In February 2007, Blair contacted an assisted living facility and paid a deposit to reserve the next available apartment for Frost.  Frost moved to the assisted living facility in August 2007.  On September 10, 2007, Frost executed another will, eliminating Gamash as legatee and naming Blair as her primary beneficiary.  Frost was admitted to the hospital for spinal surgery on September 19, 2007, and discharged to a rehabilitation center on September 27, where she remained until October 10.

[¶5]  In September 2007, Blair contacted Countrywide Bank and applied for a reverse mortgage on the property, using the POA to sign or initial numerous documents, including a "Certificate of Home Equity Conversion Mortgage Counseling" and a disclosure explaining that the loan could be accelerated if the property ceased to be the borrower's primary residence. Blair also completed a residential reverse mortgage application in which he represented that he was Frost's son and that the borrower, Frost, intended to occupy the property as her primary residence.  Frost later signed the application that Blair had completed, personally acknowledging that "the property will be occupied as certified herein."

[¶6]  In October 2007, Countrywide issued a letter to Frost stating that it had approved her application for a reverse mortgage subject to the satisfaction of several preconditions, including completion of another counseling certificate without the POA information and review and approval of the POA by the closing agent if the borrower planned to use the POA at closing.  Frost then executed a "Certificate of Home Equity Conversion Mortgage Counseling," and Countrywide's closing agent, Absolute Title, reviewed and approved the POA for use at closing.  In November 2007, Countrywide issued closing instructions to Absolute Title, directing Absolute

4

Title to postpone the closing if it "has knowledge or a belief that Borrower owns and occupies another residence not subject to this transaction and does not intend to occupy the Property." Absolute Title thereafter faxed a message to Countrywide, stating that "[Frost] is currently in Rehab. Not certain if will be able to make closing. Son – Tom Blair is contact. . . . Attached are copies of Tom[']s POA."

[¶7] On November 7, 2007, a loan closing agent met with Frost at her assisted living facility, and Frost signed and initialed each page of a promissory note and a deed of trust in connection with a Countrywide reverse mortgage loan in the original principal amount of $950,000. The note provided, inter alia, that "[a]ll outstanding principal, accrued interest, and other charges" would be immediately due and payable if the property ceased to be the borrower's principal residence. During the closing, Frost signed or initialed numerous other documents, including another residential reverse mortgage application, wherein she affirmed that she intended to occupy the property as her primary residence; and a reverse mortgage loan agreement with an attached payment plan and a schedule of closing costs. The closing agent completed a mailing affidavit, directing that future correspondence from Absolute Title would go to Blair's home address.

[¶8]  On the closing date, $40,000 was advanced on the loan, and $128,634 was paid to Saco & Biddeford Savings to extinguish a preexisting mortgage on the property.  Between March 2008 and December 2012, Frost, or Blair as POA for Frost, submitted credit request forms to the initial lender, Countrywide, and later to Countrywide's successor, BANA, drawing more than $250,000 on the mortgage.  Of that amount, $208,000 was advanced through Blair's use of the POA.

[¶9]  When Frost died in December 2012, she owned the property encumbered by BANA's mortgage.[1]

## II.  PROCEDURAL HISTORY

[¶10]  After Frost's death, Gamash initiated a will contest, asserting that Frost's 2007 will was a product of Blair's undue influence.  In conjunction with that contest, Gamash petitioned for a declaratory judgment that the note and mortgage held by BANA were invalid because they were "created through" a POA that lacked the statutory notices required by 18-A M.R.S.A. § 5-508 (1998 & Supp. 2004),[2] and because the lender and its agents "were aware that it was

---

[1]  After Frost's death, BANA assigned the mortgage to Reverse Mortgage Solutions, Inc. (RMSI). In May 2013, RMSI assigned the mortgage back to BANA.

[2]  Although Gamash's petition referred to 18-A M.R.S.A § 5-508 (1998 & Supp. 2005), the amendments to the statute enacted in 2005 did not take effect until September 17, 2005, eight days after Frost executed the POA on September 9, 2005.  *See* P.L. 2005, ch. 184, § 1 (effective Sept. 17, 2005); P.L. 2005, ch. 284, § 2 (effective Sept. 17, 2005).  In this opinion, we refer to the statute that

6

Mr. Blair who wanted the reverse mortgage." Gamash also requested a declaration that the mortgage advances were invalid because they were "secured through the use of" that same defective POA. BANA filed an answer, asserted defenses, and filed a counterclaim requesting a declaratory judgment either that the mortgage and note were valid or that BANA was entitled to an equitable lien on the property in the amount of the mortgage that was used to pay off the preexisting mortgage.

[¶11] Gamash moved for a summary judgment, asking the court to declare that defects in the POA rendered the note, the mortgage, and the mortgage advances secured through the POA invalid, and that BANA was not entitled to an equitable lien on the property. BANA filed a cross-motion for summary judgment, requesting the same declaratory relief that it had requested in its counterclaim and arguing, inter alia, that (1) even if the POA was invalid, the mortgage was valid because (a) Blair had apparent authority to act as Frost's agent and (b) Frost ratified Blair's actions in the loan application process, and (2) there was no dispute of fact concerning fraud that would invalidate the mortgage. Gamash opposed BANA's cross-motion,

was in effect on September 9, 2005—i.e., 18-A M.R.S.A. § 5-508 (1998 & Supp. 2004). We also note that 18-A M.R.S. §§ 5-501 to 5-510 have since been repealed, and the notice requirements for powers of attorney have been reenacted in amended form at 18-A M.R.S. § 5-905 (2015). *See* P.L. 2009, ch. 292 §§ 1-2 (effective July 1, 2010).

arguing that the mortgage was invalid because BANA, through its predecessor Countrywide and Countrywide's agent, Absolute Title, had "perpetuated and ratified" Blair's fraud in the mortgage documents by proceeding with the transaction when "it knew or should have known" that Frost did not intend to occupy the property as her primary residence.

[¶12]  On August 19, 2015, the court entered a summary judgment in favor of BANA, concluding that, although the POA was invalid because it did not include certain mandatory notices, the note and mortgage were valid obligations of Frost's estate because Frost had personally executed the loan closing documents and thereby ratified Blair's use of the invalid POA in the loan application process.  Gamash thereafter filed a "motion for clarification," inquiring whether the summary judgment foreclosed a trial on (1) her claims that the note and mortgage were vitiated by fraud, and that the mortgage advances procured by Blair's use of the invalid POA were invalid, or (2) BANA's claim that it was entitled to an equitable lien.

[¶13]  On October 23, 2015, the court entered an order, pursuant to M.R. Prob. P. 59 and M.R. Civ. P. 59(e), issuing further conclusions and otherwise denying Gamash's motion.  The court concluded that Gamash had failed to generate a factual dispute as to fraud in the formation of the mortgage.  With

respect to the validity of the mortgage advances, the court stated, "Where the loan and mortgage itself was valid, and any advances were made to and for the benefit of the mortgagor, it only makes sense that [BANA] has the right to recoup those payments . . . . There are no issues of fact to be tried regarding the advances." The court did not reach the issue of whether BANA was entitled to an equitable lien on the property because it concluded that BANA had adequate remedies at law pursuant to its valid mortgage.

[¶14] Gamash appealed. *See* 18-A M.R.S. § 1-308 (2015).

## III. DISCUSSION

[¶15] We review a ruling on cross-motions for summary judgment de novo, considering the properly presented evidence and any reasonable inferences that may be drawn therefrom in the light most favorable to the nonprevailing party, in order to determine whether there is a genuine issue of material fact and whether any party is entitled to a judgment as a matter of law. *See Budge v. Town of Millinocket*, 2012 ME 122, ¶ 12, 55 A.3d 484; *F.R. Carroll, Inc. v. TD Bank, N.A.*, 2010 ME 115, ¶ 8, 8 A.3d 646. "When the material facts are not in dispute, we review de novo the trial court's interpretation and application of the relevant statutes and legal concepts." *Remmes*, 2015 ME 63, ¶ 19, 116 A.3d 466. "Summary judgment is appropriate

when review of the parties' statements of material fact and the record evidence to which the statements refer, considered in the light most favorable to the nonprevailing party, demonstrates that there is no genuine issue of material fact that is in dispute and the prevailing party is entitled to judgment as a matter of law." *Id.* ¶ 18.

[¶16]  Gamash argues that the court erred by concluding that (1) Frost effectively ratified Blair's use of the POA in the loan application process; (2) there was no dispute of fact as to whether the note and mortgage were vitiated by fraud; and (3) there was no dispute of fact that the mortgage advances were made for Frost's benefit.  We consider these issues in turn.

A.    Whether Frost Ratified Blair's Use of the POA in the Application Process

[¶17]    When Frost executed the POA in September 2005, Title 18-A M.R.S.A. § 5-508(d) mandated the inclusion of certain statutory notices in any durable financial POA.[3]    There is no dispute that the POA of

---

[3]  At that time, 18-A M.R.S.A. § 5-508(d) provided as follows:

**(d)** A durable financial power of attorney must contain the following language:

"Notice to the Principal: As the "Principal," you are using this Durable Power of Attorney to grant power to another person (called the "Agent" or "Attorney-in-fact") to make decisions about your money, property or both and to use your money, property or both on your behalf.  If this written Durable Power of Attorney does not limit the powers that you give your Agent, your Agent will have broad and sweeping powers to sell or otherwise dispose of your property and spend your money without advance notice to you or approval by you.  Under this document, your Agent will continue to have these powers after you become incapacitated, and you may also

September 2005 did not contain the notices required by section 5-508(d). The Probate Court concluded that the omission of the statutory notices rendered the POA invalid. Because BANA did not file a cross-appeal from that conclusion, we do not consider BANA's unpreserved contention that the POA was excepted from the statutory notice requirements. *See MaineToday Media, Inc. v. State*, 2013 ME 100, ¶ 28 n.17, 82 A.3d 104 (declining to consider an argument when its proponent failed to preserve it by filing an appeal).

---

choose to authorize your Agent to use these powers before you become incapacitated. The powers that you give your Agent are explained more fully in the Maine Revised States, Title 18-A, sections 5-501 to 5-508 and in Maine case law. You have the right to revoke or take back this Durable Power of Attorney at any time as long as you are of sound mind. If there is anything about this Durable Power of Attorney that you do not understand, you should ask a lawyer to explain it to you.

Notice to the Agent: As the "Agent" or "Attorney-in-fact," you are given power under this Durable Power of Attorney to make decisions about the money, property or both belonging to the Principal and to spend the Principal's money, property or both on that person's behalf in accordance with the terms of this Durable Power of Attorney. This Durable Power of Attorney is valid only if the Principal is of sound mind when the Principal signs it. As the agent, you are under a duty (called a "fiduciary duty") to observe the standards observed by a prudent person dealing with the property of another. The duty is explained more fully in the Maine Revised Statutes, Title 18-A, sections 5-501 to 5-508 and Title 18-B, sections 802 to 807 and chapter 9 and in Maine case law. As the Agent, you are not entitled to use the money or property for your own benefit or to make gifts to yourself or others unless the Durable Power of Attorney specifically gives you the authority to do so. As the Agent, your authority under this Durable Power of Attorney will end when the Principal dies and you will not have the authority to administer the estate unless you are authorized to do so in accordance with the Probate Code. If you violate your fiduciary duty under this Durable Power of Attorney, you may be liable for damages and may be subject to criminal prosecution. If there is anything about this Durable Power of Attorney or your duties under it that you do not understand, you should ask a lawyer to explain it to you." This language does not confer powers not otherwise contained in the durable financial power of attorney.

[¶18]  We do, however, consider Gamash's argument that the court erred when it concluded that the note and mortgage are valid, notwithstanding Blair's use of the invalid POA in the loan application process, because Frost effectively ratified Blair's actions when she signed the operative loan documents.  Our review is informed by the following principles of agency.

[¶19]  Although the action of a purported agent is of no legal effect if the action exceeds the authority granted by the principal, *see Casco N. Bank, N.A. v. Edwards*, 640 A.2d 213, 215 (Me. 1994), a principal may ratify the action and thereby give legal effect to a transaction otherwise inoperative as to the principal, *see QAD Investors, Inc. v. Kelly*, 2001 ME 116, ¶ 21, 776 A.2d 1244, by manifesting an intention to be a party to the transaction, *Wilkins v. Waldo Lumber Co.*, 130 Me. 5, 12, 153 A. 191 (1931).  In order to ratify an agent's conduct, a principal must have knowledge of all material facts.  *QAD Investors, Inc.*, 2001 ME 116, ¶ 21, 776 A.2d 1244.  "The intention to ratify may be manifested by express words or by conduct."  *Wilkins*, 130 Me. at 12 (quotation marks omitted).  A principal may ratify the unauthorized action of a purported agent through conduct by accepting the benefits of the action.  *Id.*

[¶20]  Here, it is undisputed that Blair used the invalid POA to execute a number of documents in the loan application process.  It is also undisputed

that Frost signed multiple documents in the loan application process, as well as the promissory note, the deed of trust, and many other documents in the course of closing the loan.[4] At oral argument, Gamash asserted—for the first time in this proceeding—that Frost was incompetent at the time of closing. This contention was not preceded by similar allegations in Gamash's complaint, summary judgment pleadings, or appellate brief, and it is not supported by any evidence in the summary judgment record. Because Gamash failed to alert the trial court and the opposing party that she intended to litigate the issue of competence, we will not consider the issue now. *See Foster v. Oral Surgery Assocs., P.A.*, 2008 ME 21, ¶ 22, 940 A.2d 1102.

[¶21] Based upon the undisputed facts contained in this summary judgment record, we conclude that Frost demonstrated a knowledge of the material facts and indicated her consent to be bound by the mortgage when she signed the operative mortgage documents. Among those documents was a reverse mortgage loan agreement and an attached payment plan, showing that the reverse mortgage would be used to extinguish the preexisting

---

[4] Although Gamash asserts that Blair induced Frost to sign the operative mortgage documents, and BANA asserts that Frost signed the application of her own free will, we conclude that the summary judgment record does not properly present a factual dispute on this issue because the conflicting assertions are not positively set forth, but instead appear as new facts in statements that qualify or object to affirmative statements of fact. *See Doyle v. Dep't of Human Servs.*, 2003 ME 61, ¶ 11, 824 A.2d 48 ("A court need not consider additional facts when, as here, they are improperly commingled in . . . [responsive] paragraphs . . . .").

mortgage of $128,634, and that $40,000 would initially be advanced. The summary judgment record establishes, without any dispute, that the reverse mortgage inured to Frost's benefit, at least to the extent that it was used to extinguish the preexisting mortgage. We therefore affirm the trial court's conclusion that the mortgage and note are valid because Frost ratified Blair's use of the invalid POA in the loan application process.[5]

B.     Whether the Note and Mortgage Were Vitiated by Fraud

[¶22]   We next address Gamash's argument that the court erred in concluding that the summary judgment record establishes, without any material dispute of fact, that the mortgage and note were not vitiated by fraud. Gamash specifically contends that the summary judgment record establishes that the mortgage and note are invalid because BANA, through its

---

[5] Because Gamash has not provided any legal basis for voiding or avoiding the mortgage as a remedy for defects in the mortgage application process, we decline to consider her argument that the mortgage application documents that Blair executed pursuant to the invalid POA were "integral aspects of" and "regulatory predicates to" a valid mortgage, rendering it legally impossible for Frost to ratify the mortgage by signing the operative documents. We also reject Gamash's argument that a principal cannot ever ratify actions undertaken under authority granted by a POA when the POA lacks required statutory notices. In support of this contention, Gamash cites *Lubin v. Klein*, 193 A.2d 46 (Md. 1963) and *Citizens Bank of N. Ky., Inc. v. PBNK, Inc.*, No. 2004-CA-001351-MR, 2006 Ky. App. LEXIS 826 (Ky. Ct. App. Feb. 17, 2006), which concern the validity of a mortgage signed by a purported agent who lacked actual authority. These cases are inapposite to the issue here, which concerns the validity of a mortgage signed by the principal.

In light of our conclusion that Frost ratified Blair's actions in the loan application process and thereby validated the note and mortgage, we need not address BANA's argument that Blair acted with apparent authority in the application process. It is also unnecessary to consider whether BANA is entitled to an equitable lien.

predecessor, Countrywide, and Countrywide's agent, Absolute Title, ratified Blair's misrepresentations in the mortgage documents by proceeding with the transaction when "it knew or should have known" of those misrepresentations. In the alternative, Gamash argues that the summary judgment record reflects a dispute of material fact as to whether the mortgage and note were vitiated by fraud. BANA contends that we should not reach the merits of this issue because Gamash lacks standing to assert a fraud claim.

[¶23] We assume, without deciding, that Gamash has standing to assert a fraud claim as part of her challenge to the validity of Frost's 2007 will. As the party that moved for summary judgment on the issue of fraud, BANA bears the burden of demonstrating that Gamash's summary judgment materials do not establish a prima facie case for each element of fraud. *See Budge*, 2012 ME 122, ¶ 12, 55 A.3d 484. In reviewing the summary judgment entered on the issue of fraud, we therefore consider whether the evidence demonstrates specific facts that support Gamash's claim that Countrywide or Absolute Title misrepresented a material fact, with knowledge of its falsity or in reckless disregard of its truth or falsity, and that Frost reasonably relied on the misrepresentation to her detriment. *See Barnes*

*v. Zappia*, 658 A.2d 1086, 1089 (Me. 1995) (setting forth the elements of fraud).

[¶24] Even when viewed in the light most favorable to Gamash, the summary judgment record does not establish a prima facie case that the lender or its agent engaged in fraud with respect to the mortgage. Instead, the record demonstrates that (1) during the application process, Blair misrepresented that he was Frost's son and that Frost intended to reside primarily at the property; and (2) at closing, Frost signed a document affirming that she intended to occupy the property as her principal residence. To the extent that these statements were misrepresentations, their effect was to increase the likelihood that Countrywide would issue the mortgage to Frost. To the extent that there was any fraud, the facts in the summary judgment record indicate that the fraud was perpetuated by Blair and Frost against the lender. Because Gamash has provided no basis for imputing any false statements to the lender, the statements provide no basis for Gamash, as Frost's heir, to set the mortgage aside. For this reason, the trial court did not err by granting summary judgment in favor of BANA on Gamash's fraud claim.

16

C.    Whether Frost Ratified the Mortgage Advances

[¶25]  Finally, we consider whether the trial court erred by ruling that the mortgage advances are valid (notwithstanding Blair's use of the invalid POA to procure some of them) because it is undisputed that Frost retained the benefit of the advances.  As the party who moved for a summary judgment on this issue, Gamash bore the burden of establishing each element of her claim of invalidity by properly placing the facts material to that claim before the court. *See N. Star Capital Acquisition, LLC v. Victor*, 2009 ME 129, ¶ 8, 984 A.2d 1278.

[¶26]  In her statement of material facts, Gamash asserts, with reference to proper supporting evidence, that Blair used the invalid POA to secure advances on the mortgage totaling $208,000.[6]  Because BANA does not controvert this properly supported fact, it is deemed admitted.  *See* M.R. Civ. P. 56(h)(4).  Moreover, because the POA did not give Blair the authority to act on Frost's behalf, the mortgage advances of $208,000 secured pursuant to the POA were not binding on Frost when they were made.  *See Perkins v.*

---

[6] As already noted, these funds were advanced after the mortgage instrument was executed and proceeds of $128,634 were applied from that loan to extinguish Frost's preexisting mortgage on the property.

*Philbrick*, 443 A.2d 73, 74 (Me. 1982) (concluding that an attorney who settled a client's claim without authority did not bind the client to the settlement).

[¶27]  However, as with the validity of the mortgage instrument itself, the validity of the mortgage advances could be established through proof that Frost subsequently ratified the advances.  As the party relying on ratification to establish the validity of the unauthorized advances, BANA bore the burden of demonstrating that ratification occurred.  *See Hyams v. Old Dominion Co.*, 113 Me. 294, 300, 93 A. 747 (1915).  In Gamash's additional statement of material facts, she asserted that Blair was the primary beneficiary of the funds advanced on the mortgage.  BANA did not file any response to this statement, or otherwise properly assert that it was Frost, rather than Blair, who benefited from the mortgage advances secured through the POA.

[¶28]  At oral argument, BANA averred that it had contested Gamash's assertion that Blair benefited from the mortgage advances by referring in its statement of material facts to the affidavit of Blair.  Although Blair's affidavit states that Frost benefited from the mortgage advances, this statement was not properly before the court because it is not found anywhere in BANA's statements of material facts.  *See Cach, LLC v. Kulas*, 2011 ME 70, ¶ 10 n.3, 21 A.3d 1015 ("[A] court should consider *only* the portions of the record

referred to in the Rule 56(h) statements and is neither *required nor permitted* to independently search a record to find support for facts offered by a party." (quotation marks omitted)); *Chase Home Fin. LLC v. Higgins*, 2009 ME 136, ¶ 12 n.4, 985 A.2d 508 ("Facts not set forth in the statement of material facts are . . . not in the summary judgment record."); *see also HSBC Bank USA, N.A. v. Gabay*, 2011 ME 101, ¶ 17, 28 A.3d 1158 (explaining that the rigors of Rule 56 must be enforced on appeal).

[¶29]  In sum, the invalid POA was used to obtain $208,000 in mortgage advances that did not bind Frost.  Unlike the mortgage instrument itself, which was signed by Frost and inured to her benefit to the extent that it extinguished a preexisting mortgage on the property, there is no evidence in the summary judgment record that the $208,000 in mortgage advances secured through the invalid POA were ratified by Frost's words or conduct. Because Gamash established that BANA advanced $208,000 on the mortgage pursuant to an invalid POA, and BANA failed to carry its burden of presenting evidence that Frost ratified the advances obtained pursuant to the invalid POA, the court erred in concluding that the mortgage advances secured through the POA were valid.  Summary judgment on this issue should have been entered in favor of Gamash.

The entry is:

> Summary judgment in BANA's favor affirmed as to the validity of the note and mortgage. Summary judgment in BANA's favor vacated as to the validity of the $208,000 in mortgage advances secured through the invalid POA. Remanded for the entry of a summary judgment in Gamash's favor that the mortgage advances secured through the invalid POA are not binding on Frost's estate.

---

**On the briefs:**

John F. Lambert, Jr., Esq., and Abigail C. Varga, Esq., Lambert Coffin, Portland, for appellant Nancy Gamash

Bradley M. Lown, Esq., Coughlin, Rainboth, Murphy & Lown, P.A., Portsmouth, New Hampshire, for appellee Bank of America, N.A.

**At oral argument:**

Abigail C. Varga, Esq., for appellant Nancy Gamash

Bradley M. Lown, Esq., for appellee Bank of America, N.A.

Cumberland County Probate Court docket number 2013-451
FOR CLERK REFERENCE ONLY