2012 ME 13

**MRS. T., as Parent and Next Friend of C.T.**

v.

**COMMISSIONER OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES.**

Supreme Judicial Court of Maine.

Argued: Dec. 12, 2011.
Decided: Feb. 2, 2012.

Richard L. O'Meara, Esq., and Nicole L. Bradick, Esq. (orally), Murray, Plumb & Murray, Portland, for appellant Mrs. T.

William J. Schneider, Attorney General, and James E. Fortin, Asst. Atty. Gen. (orally), Augusta, on the briefs, for appellee Department of Health and Human Services.

Panel: SAUFLEY, C.J., and ALEXANDER, SILVER, MEAD, GORMAN, and JABAR, JJ.

MEAD, J.

[¶1] Pursuant to M.R. Civ. P. 80C, Mrs. T.[1] appeals from a final judgment[2] of the Superior Court (Cumberland County, *Wheeler, J.*) affirming a decision of the Commissioner of the Department of Health and Human Services accepting the recommendation of an administrative hearing officer to deny Mrs. T.'s grievance against the Department, which sought to establish that her son, C.T., was eligible for certain Department-funded services. Mrs. T. contends that the Department was equitably estopped from denying the services because she reasonably relied to her detriment on the Department's misrepre-

sentations that C.T. was eligible. The Department argues that the hearing officer, the Commissioner, and the court all correctly found that there was no causal connection between misinformation that Mrs. T. received and her son's ineligibility for services, and therefore her reliance on the misinformation was not detrimental. We affirm the judgment.

## I. BACKGROUND

[¶2] The facts found by the hearing officer and the Superior Court are not materially disputed. *See Dep't of Health and Human Servs. v. Pelletier,* 2009 ME 11, ¶15, 964 A.2d 630 ("We review a judgment on a defense of equitable estoppel for clear error as to factual findings. . . ."). Mrs. T. is the mother of C.T., a fifteen-year-old boy with severe disabilities. As a result of his disabilities and self-injurious behaviors, C.T. requires continuous one-to-one, trained adult supervision. In June 2003, after unsuccessful attempts to provide services to C.T. in his home and at a program in New Jersey, Mrs. T. and the Department placed him at a residential facility in New Hampshire about two hours away from the family home in Maine, where he remains today. Although the Department intended that C.T. live at the New Hampshire facility only until a suitable placement could be located in Maine, it has been unable to secure such a placement. Mrs. T. has always wanted C.T. to be placed in Maine closer to the family home.

[¶3] At the heart of this appeal is C.T.'s eligibility for the Department's "Section 21 Home and Community–Based

1. The Superior Court allowed the plaintiffs to use the aliases Mrs. T. and C.T.

2. Mrs. T.'s complaint in the Superior Court alleged three counts; Counts II and III were stayed pending a decision on Count I, which sought Rule 80C review of the Commissioner's decision. The court certified its judgment on Count I as a final judgment pursuant to M.R. Civ. P. 54(b). We do not disturb that determination.

Waiver" program (waiver), which provides a funding stream to pay for necessary services in a client's home or in a residential center instead of in an institution. Earl Babcock, who managed the waiver program for the Department, testified that at the time of the administrative hearing there were 2, 850 people being served by the program, twelve of whom were children.[3] Babcock's duties included classifying applicants and making eligibility determinations for the program.

[¶ 4] Robert Barton, a regional supervisor for the Department in Children's Behavioral Health Services, testified at the hearing that the children in the waiver program "are the very neediest kids for children's services, very high-needs kids." Barton encouraged Mrs. T. to apply for a waiver for C.T. in order to secure a funding stream for a Maine placement if one were found. In January 2005, after initially denying Mrs. T.'s application, the Department granted C.T. a waiver. Although Barton termed it a "miscommunication," Mrs. T. testified, and the hearing officer and the court accepted, that Barton told her C.T. now effectively had a lifetime waiver. The Department made efforts to find C.T. a waiver placement in Maine. However, those efforts were complicated by his high needs, funding issues, and Department regulations prohibiting the placement of minors with more than a five-year age difference in the same residence. Barton told C.T.'s case manager and Mrs. T. to take their time in finding the right placement.

[¶ 5] In July 2005, the Department filed with federal authorities an application for renewal of the waiver program, and in the process sought to close the program to children but to grandfather children who were "already receiving services." A new regulation containing that change took effect on December 30, 2007. The current regulation states that "a person is eligible for [waiver] services under this Section if the person . . . [i]s age eighteen (18) or older (members younger than age 18 *and already receiving services under this Section as of the effective date of this rule* may continue to receive benefits under this Section)[.]" 10–144 C.M.R. ch. 101, § 21.03–3 (effective July 1, 2010) (emphasis added).

[¶ 6] At the time the new restriction took effect, C.T. had been approved for the waiver program, but was not receiving services under the waiver. Mrs. T. was not made aware of any change in C.T.'s waiver status until March 2009, when C.T.'s case manager learned of the new regulation. Before then, Mrs. T. had been told on several occasions by Barton, and once by another Department representative, that C.T. was grandfathered.[4] Before the new regulation took effect, in August 2006, Mrs. T. received a letter from a children's systems manager for Children's Behavioral Health Services, advising her that despite the Department's intention to close the waiver program to minors: "Adult Services and Children's Services have agreed to honor our mutual commitment to the children currently receiving, or those having already been approved for services in this waiver program." Earl Babcock testified that the statement in the letter was incorrect. After learning in March 2009 that the waiver regarding C.T. was no longer effective,

---

**3.** Earl Babcock submitted an affidavit that was admitted at the administrative hearing. He was cross-examined at a deposition held one week later; by agreement a transcript of the deposition was also made part of the record considered by the hearing officer.

**4.** The court found that Barton's misrepresentations were not intentional, but correctly noted that intent is not a factor in the equitable estoppel analysis. *See Berry v. Bd. of Trustees, Me. State Ret. Sys.,* 663 A.2d 14, 19–20 n. 12 (Me.1995).

Mrs. T. sought and received a proposal from a residential home in Lewiston to provide care for C.T. contingent on funding through the waiver program; there is no other current source of funding for that placement.

[¶ 7] In September 2009, Mrs. T. filed a grievance with the Department seeking to have C.T. declared waiver-eligible, and for approval of the Lewiston placement funded by the waiver. The grievance was heard by a hearing officer in November 2009. The hearing officer found that C.T. was not eligible for a waiver and recommended that the grievance be denied, concluding that the Department was not equitably estopped from denying the waiver under the current regulation. The Commissioner accepted the hearing officer's recommendation. In February 2010, Mrs. T. filed a Rule 80C petition in the Superior Court seeking review of the Commissioner's action. After hearing oral argument the court denied the petition, agreeing with the hearing officer that the Department was not equitably estopped from denying C.T. waiver services. This appeal followed.

## II. DISCUSSION

[¶ 8] The sole issue before us is whether the hearing officer erred as a matter of law in finding that the doctrine of equitable estoppel is not applicable to these facts. *See Tenants Harbor Gen. Store, LLC v. Dep't of Envtl. Prot.,* 2011 ME 6, ¶ 8, 10 A.3d 722 (stating that when the Superior Court reviews a state agency's decision in an appellate capacity, "we review the agency's decision directly for errors of law, findings not supported by the evidence, or an abuse of discretion").

[¶ 9] The activities of a governmental entity may be equitably estopped if the party asserting the doctrine, in this case Mrs. T., can prove "that (1) the statements or conduct of the governmental offi-

cial or agency induced the party to act; (2) the reliance was detrimental; and (3) the reliance was reasonable." *Pelletier,* 2009 ME 11, ¶ 17, 964 A.2d 630; *see Mathieu v. Comm'r of Human Servs.,* 562 A.2d 686, 689 (Me.1989) (stating that the party asserting estoppel has the burden of proof). We consider "the totality of the circumstances, including the nature of the government official or agency whose actions provide the basis for the claim and the governmental function being discharged by that official or agency." *Pelletier,* 2009 ME 11, ¶ 17, 964 A.2d 630 (quotation marks omitted).

[¶ 10] However, when a party seeks to estop the government we have viewed the claim with caution. *See id.* ¶ 19 ("Equitable estoppel must be evaluated with circumspection and applied judiciously in the context of child support actions brought by the Department."); *Hart v. County of Sagadahoc,* 609 A.2d 282, 284 (Me.1992) (stating, in discussing a claim of equitable estoppel, that "[a]s a general proposition ... a governmental unit is not subject to estoppel to the same extent as a private party"); *Mathieu,* 562 A.2d at 689 (stating that, as against the government, the doctrine of equitable estoppel "should be sparingly used"); *Trull Nursing Home, Inc. v. Dep't of Human Servs.,* 461 A.2d 490, 499 n. 16 (Me.1983) ("Estoppel against the government should be 'carefully and sparingly applied,' especially where application would have an adverse impact on the public fisc." (citations omitted)).

[¶ 11] Here, the hearing officer found that the Department gave Mrs. T. "misinformation" concerning C.T.'s waiver status, but ultimately concluded that "[t]here is no evidence to support a causal link" between that misinformation and C.T.'s current ineligibility for a waiver—in other words, the necessary element of *detrimental* reliance was missing. Mrs. T. argues that the hearing officer erred as a matter of law

because in order to show detrimental reliance she is not required to prove that she would have succeeded in finding a Maine placement for C.T. had she known that his eligibility for a waiver was ending. Rather, she asserts that it is enough that she lost the opportunity to more vigorously pursue a Maine placement as a result of the Department's misinformation.

[¶ 12] Contrary to Mrs. T.'s assertion, however, there was an almost three-year window of opportunity for Mrs. T. or the Department to find a placement between January 2005, when C.T. was approved for a waiver, and December 2007, when the waiver program closed to minors. The hearing officer found that during that time the Department made sincere, but ultimately unsuccessful, efforts to locate an appropriate placement for C.T. in Maine, efforts that were hindered by funding limitations and regulations that restricted the age of clients that could be placed in the same residence. As the party with the burden of proof, Mrs. T. has not shown that that finding is not supported by the evidence.[5] *See Tenants Harbor Gen. Store, LLC,* 2011 ME 6, ¶ 8, 10 A.3d 722.

[¶ 13] Furthermore, although Mrs. T. did ultimately secure a proposal from a potentially appropriate residential placement in Lewiston after learning in 2009 that C.T. was no longer eligible for a waiver, there is no evidence to support a finding that (1) the placement was available when the waiver program closed to C.T. in December 2007; (2) the Department would have approved the placement; and (3) funding would have been available at that time. To the contrary, Earl Babcock averred that "even if [C.T.] continued to be eligible for waiver services, the waiver program is not currently serving any new participants and his position on the lower priority waiting list makes it doubtful that he would receive waiver services in the foreseeable future." At his deposition Babcock testified that C.T. was classified as a Level 2 priority from the time he was first approved for a waiver, and he did not believe that a Level 2 client had ever come off the waiting list into the program.

[¶ 14] Given this record, there is no persuasive evidence that Mrs. T. would have successfully found C.T. a waiver placement in Maine before December 30, 2007, had she known that C.T.'s eligibility for a waiver would end on that date. Accordingly, because Mrs. T. did not meet her burden to prove that her reliance on the misinformation given to her by the Department caused any detriment to C.T., the hearing officer did not err in finding that the Department was not equitably estopped from declaring C.T. ineligible for a waiver. As the hearing officer concluded in her written decision:

> [T]he reason C.T. is not currently eligible for the waiver is not the result of misinformation [Mrs. T.] received from the Department. Rather, his ineligibility is the result of a rule change which unfortunately did not protect the status of a child like C.T. who had been found eligible, but was not receiving waiver services at the time.

The entry is:

Judgment affirmed.

5. At oral argument, Mrs. T. pointed to Robert Barton's testimony that he mistakenly believed the waiver program had closed to children in July 2006, and had he known it was "closing," not "closed," "we would have been ... working very hard to move [C.T.] back." Although it may be reasonable to conclude from that statement that Barton's urgency to find C.T. a Maine placement would have been different, it does not follow as a matter of proof that he would have been any more successful in doing so.