2012 ME 122

**Norman E. BUDGE et al.**

v.

**TOWN OF MILLINOCKET.**

Supreme Judicial Court of Maine.

Argued: April 12, 2012.
Decided: Oct. 25, 2012.

Paul W. Chaiken, Esq., and John K. Hamer, Esq. (orally), Rudman Winchell, LLC, Bangor, for appellants Norman E. Budge et al.

Melissa A. Hewey, Esq., and Jeffrey T. Piampiano, Esq. (orally), Drummond Woodsum, Portland, for appellee Town of Millinocket.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, GORMAN, and JABAR, JJ.

Majority: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, and GORMAN, JJ.

Dissent: JABAR, J.

GORMAN, J.

[¶ 1] Norman E. Budge and twenty-eight additional parties[1] (collectively, employees) appeal from a summary judgment of the Superior Court (Penobscot County, *Marden, J.*) in favor of the Town of Millinocket. This appeal concerns three issues: (1) whether a 1991 personnel policy adopted as a town ordinance created an enforceable contract between the Town and its employees; (2) whether the Town is bound to pay the employees' retirement group hospitalization and life insurance premiums by virtue of promissory estoppel; and (3) whether the Town's reduction in benefits resulted in a taking without just compensation in violation of the Maine and United States Constitutions, U.S. Const. amends. V, XIV, § 1; Me. Const. art. I, § 21. We affirm the judgment.

## I. BACKGROUND

[¶ 2] On July 14, 2009,[2] the employees filed a complaint for review of government action pursuant to M.R. Civ. P. 80B. This complaint included four counts: (1) review of government action pursuant to Rule 80B, (2) breach of contract, (3) unconstitutional taking, and (4) promissory estoppel.

On December 8, 2009, the Superior Court granted the Town's motion to dismiss count one, but denied the Town's motion with respect to the remaining three counts. On April 15, 2011, the Town filed a motion for summary judgment, a statement of material facts, and an affidavit of the Millinocket town manager. The employees opposed the motion and, after a hearing, the court granted a summary judgment to the Town on all three remaining counts.

[¶ 3] The undisputed material facts establish that the Town has included a personnel policy in its Municipal Code since 1978. As of 1987, the first sections of the personnel policy stated:

1. PURPOSE

It is the purpose of these rules and regulations to provide a uniform and standard system of personnel administration and to inform fully the non-union employees of the Town of Millinocket the conditions of work.

2. ADMINISTRATION

These rules shall be administered by the Town Manager. He may, through the department heads and foremen, specify procedure for the administration of this policy to insure a minimum of disruption of Town operations. However, in no way are the administrative procedures to alter or dilute the meaning or intent of this policy in the application of said procedures.

3. AMENDMENTS

Amendments to these rules shall be by order of the Town Council. The

---

**1.** The additional appellants are Ronald G. York, William Levesque, Richard L. Leavitt, Charles J. James, John Picard Sr., Milan Thornton, Reid Campbell, John M. MacPherson, Donald Bolduc, Bruce Leavitt, Joseph A. Beaulieu, Thomas Monteith, Jasper Haynes, Stephen Campbell, Ethel McVey, Warren Nelson, Frank C. Friel, Donald Benson, Nadine Boddy, Wayne Campbell, Louise Morey, Sa-rah Boutaugh, Jon Crawford, Jon Glidden, Basil Campbell, Robert Lander, Doris Lowell, and James Farley.

**2.** Although the employees filed their initial complaint on June 10, 2009, they amended it twice and filed their final complaint on July 14, 2009.

Personnel Policy shall be reviewed AN-NUALLY by the Manager and a delegate of the non-union employees. Revisions shall be submitted to the Town Council for consideration.

Millinocket, Me., Personnel Policy § 1 (Jan. 1, 1987). This introduction states that the purpose of the policy is to inform employees of the Town's uniform system for conditions of work. It also announces the method by which the policy would be reviewed for possible revision on an annual basis.

[¶ 4] Before 1991, section 17 of the policy addressed the Town's retirement plan by stating that the Town was a participating member of the Maine State Retirement System.[3] Millinocket, Me., Personnel Policy § 17 (Jan. 1, 1987). It also stated that the Town had life insurance and group hospitalization plans that were "funded 100% by the Municipality for employees, spouse and children." Millinocket, Me., Personnel Policy § 17(2) (Jan. 1, 1987). It made no mention of whether or how the life or group hospitalization plans would apply to retirees.

[¶ 5] On August 8, 1991, the Town amended its personnel policy to address for the first time group hospitalization insurance benefits for its retirees. The three paragraphs quoted above still comprised the introduction to the personnel policy in the Municipal Code, and the policy continued to state that the Town's life insurance and group hospitalization plans were funded 100% by the Town for its employees, their spouses, and their children. Millinocket, Me., Personnel Policy § A128–17(B) (Oct. 25, 1991). In the amendment made that year, the Town added the following language:

Employees, other than School Department employees, who retire from town service and qualify for retirement or disability benefits under the Maine State Retirement System shall continue as members of the town's group hospitalization plan, at the town's expense, *to the same extent as current employees.* The town shall also pay for coverage for the former employee's spouse. This benefit shall apply to former union employees of the town, as well as nonunion employees. *The town reserves the right to change this benefit in the future as circumstances require. Any such changes shall apply only to employees hired after August 8, 1991.*

Millinocket, Me., Personnel Policy § A128–17(D) (Oct. 25, 1991) (emphasis added). The emphasized language is the basis for the employees' breach of contract claim in this case. The trial court determined, however, that their contract-based claim was undermined by the changes the Town Council made to the policy in the following years.

[¶ 6] In 1999, the three paragraphs quoted above still comprised the introduction to the personnel policy, but the Town amended the policy in three ways that affect this case. First, it altered section A128–17(B) to reduce the portion of the premium the Town was obliged to pay for employee and dependent coverage from 100% to 90%. Millinocket, Me., Personnel Policy § A128–17(B) (July 10, 1999). Second, also in section A128–17(B), the Town included the following language for the first time: "The town reserves the right to discontinue this benefit or to change coverage and providers from time to time as well as the portion of the premiums paid by the town and its employees with or without prior notice." Millinocket, Me., Personnel Policy § A128–17(B) (July 10,

---

**3.** The Maine State Retirement System has since been renamed the Maine Public Employees Retirement System. P.L.2007, ch. 58, § 1 (codified at 5 M.R.S. § 17101(2) (2011)).

1999). Third, the Town amended section A128–17(D), replacing the emphasized language quoted above from the 1991 policy with the following language:

Employees hired prior to August 8, 1991, other than School Department employees, who retire from town service and qualify for retirement or disability benefits under the Maine State Retirement System shall continue as members of the town's group hospitalization plan to the same extent as current employees. The town shall also provide coverage for the former employee's spouse if the employee so elects. This benefit shall apply to former union employees of the town as well as non union employees. . . . *The town reserves the right to discontinue this benefit or to change providers and coverage from time to time as well as the portion of premiums paid by the town and former employee with or without prior notice.*

Millinocket, Me., Personnel Policy § A128–17(D) (July 10, 1999) (emphasis added).

[¶ 7] Although pursuant to the 1999 policy, the Town reduced its payment of employee premiums from 100% to 90%, the Town continued making payments of 100% for its retirees after this amendment. *See* Millinocket, Me., Personnel Policy § A128–17(B) (July 10, 1999). The record does not explain why no change was made vis-à-vis the premiums for retirees at that time.

[¶ 8] Three years later, the Town amended its policy by including language that was even more explicit in explaining that no promises were being made nor contracts created:

Statement of Intent. This policy is intended as informational guidance only and the Town reserves the right to interpret, delete, or amend the provisions contained herein with reasonable notice to employees. This policy and its con-

tents should not be interpreted as promises of specific treatment or as contractual rights for any employee.

Millinocket, Me., Personnel Policy § A128–1(A) (Jan. 1, 2002). The Town also completely revamped the retirement and group hospitalization plan provisions contained in section A128–17. With reference to retirees, it stated:

The town reserves the right to change providers and coverage from time to time as well as the portion of premiums paid by the town and former employee with or without prior notice. This benefit will apply in the following manner:

1. For employees who have retired prior to January 1, 2002, this benefit will be provided by the Town at 100% of its cost.

2. For employees who were employed full time by the Town on or before June 10, 1999 and who become eligible for retirement after January 1, 2002, those employees will make a contribution to their health insurance benefit (co-payment) at the same rate as that for current employees.

3. Unionized employees hired prior to August 8, 1991 and not retired prior to January 1, 2002 shall be eligible for this benefit as described in paragraph D–2 above.

4. For employees hired into full time positions on or after June 10, 1999, this retirement benefit shall not be available.

Millinocket, Me., Personnel Policy § A128–17(D) (Jan. 1, 2002).

[¶ 9] The Town amended its personnel policy again in 2006 and 2009. The Town amended section A128–17(B) of the policy to reduce the Town's obligation for paying for the health insurance plan for its employees, and amended section A128–17(D)

to establish a new policy for the health insurance offered to retirees. Millinocket, Me., Personnel Policy § A128–17(B), (D) (May 14, 2009). As of 2009, the retirees' benefits no longer operate in tandem with current employees' benefits. After the 2009 amendment, the Town reduced its payment of the retirees' premiums, which gave rise to this suit.

[¶ 10] The employees allege that, regardless of the policy language, this reduction was inconsistent with promises made to them either when they were hired or during their tenure with the Town.[4] The employees allege that it was common knowledge among Town employees that the Town paid 100% of group hospitalization insurance premiums for life. Many of the employees allege that the town manager promised them this benefit when they were hired. At least one employee alleges that members of the Town Council acknowledged this benefit as well. They also allege that it was common knowledge that the Town paid lower wages than the local mill, but compensated for the wage difference by offering a better benefits package, which included group hospitalization insurance for life. Many of the union employees, especially those who served as shop steward, allege that, during contract negotiations, they would accept lower pay raises in exchange for better benefits, including group hospitalization insurance for life. The union contracts, however, did not include this benefit. The employees have not produced any evidence that the alleged promises were made by official action of the Town Council, as opposed to statements of Council members or the town manager.

[¶ 11] The Town Charter outlines the powers and duties of the town manager and Town Council. Pursuant to the Town Charter, the town manager's duties and powers include appointing officers and employees of the Town, preparing the Town budget, executing the laws and ordinances of the Town, preparing the administrative code, and performing such duties that are required by the Town Charter or the Town Council. Millinocket, Me., Town Charter § C302 (Dec. 25, 1993). Likewise, the Town Charter gives the Town Council the power to appoint certain officers, and to make, alter, and repeal ordinances, but these powers are limited to a quorum of the council members. Millinocket, Me., Town Charter §§ C203, C210 (Dec. 25, 1993).

## II. DISCUSSION

[¶ 12] "We review the grant of a motion for summary judgment de novo," and consider both the evidence and any reasonable inferences that the evidence produces "in the light most favorable to the party against whom the summary judgment has been granted in order to determine" if there is a genuine issue of material fact. *Inkel v. Livingston*, 2005 ME 42, ¶ 4, 869 A.2d 745 (quotation marks omitted). "When the moving party is the defendant, the burden rests on that party to show that the evidence fails to establish a prima facie case for each element of the cause of action." *Wentworth v. Sebra*, 2003 ME 97, ¶ 9, 829 A.2d 520.

[¶ 13] This case brings us to the heart of a long-running controversy over the extent to which government employers may alter the terms of future benefits for pres-

4. Although the Town contends that neither the town manager nor members of the Town Council promised to pay 100% of retirees' group hospitalization insurance premiums indefinitely, we accept the employees' properly supported factual assertions for purposes of their opposition to the Town's motion for summary judgment. *See Inkel v. Livingston*, 2005 ME 42, ¶ 4, 869 A.2d 745.

ent employees and retirees. The employees here have asserted, alternatively, that the Town is precluded from making such alterations because language in the 1991 employee personnel policy created a contract that the Town may not breach, that the Town should be estopped from altering their benefits because of the statements made by various members of the Town's administration and by the Town's actions in continuing to pay benefits at a level higher than that required by the Town's personnel policy, or that the Town's attempt to alter their benefits amounts to an unconstitutional taking of their property. We address each contention below.

## A. Breach of Contract

[¶ 14] The first question we must answer is whether the language of the Town's 1991 personnel policy contains a clear indication that the Town intended to bind itself contractually to continue delivering certain benefits to the employees in perpetuity. This question requires us to explore the history of this type of claim in our state.

[¶ 15] Nearly twenty years ago, we aligned our jurisprudence with that of courts reluctant to conclude that a legislative enactment creates a contractual obligation without "language expressing an intent to create such rights." [5] *See Spiller v. State*, 627 A.2d 513, 516–17 (Me.1993). In doing so, we rejected a more liberal approach known as the California Rule. [6] *See id.* at 516 (citing *Betts v. Bd. of Admin. of the Pub. Emps.' Ret. Sys.*, 21 Cal.3d 859, 148 Cal.Rptr. 158, 582 P.2d 614 (1978)).

[¶ 16] Pursuant to California's approach, "a statute can create a contract in accordance with its express terms, by implication of its express terms, or where the statute essentially constitutes an offer that is accepted by performance." Amy B. Monahan, *Statutes as Contracts? The "California Rule" and its Impact on Public Pension Reform*, 97 Iowa L.Rev. 1029, 1049 (2012). Further, once a contract is found, the state may make only "reasonable modifications" to it and must offset detrimental changes with comparative new advantages. *Id.* at 1060 (quotation marks omitted) (citing *Allen v. City of Long Beach*, 45 Cal.2d 128, 287 P.2d 765 (1955)). The dissenting justices in *Spiller* urged us to adopt the California Rule, but the majority nevertheless rejected that methodology. *See Spiller*, 627 A.2d at 520 (Wathen, C.J., dissenting) (citing *Betts*, 148 Cal. Rptr. 158, 582 P.2d at 617; *Kern v. City of Long Beach*, 29 Cal.2d 848, 179 P.2d 799, 803 (1947)).

[¶ 17] Nothing has changed since our rejection of the California Rule in *Spiller* to justify an endorsement of that approach in this case. At present, only twelve other states follow the California Rule in some form. Monahan at 1071. Moreover, the same policy flaws in California's jurisprudence continue to militate against adopting that rule as the law of Maine.

---

5. The issue of whether a legislative enactment creates a contractual obligation is central to our three-part analysis of claims predicated on the Contract Clause in the constitutions of Maine and the United States. *See Kittery Retail Ventures, LLC v. Town of Kittery*, 2004 ME 65, ¶ 38, 856 A.2d 1183. Our decision in *Spiller v. State*, along with other precedent cited here, adjudicates the existence of a contract in that context. 627 A.2d 513, 515 (Me. 1993). In this case, the employees did not seek relief pursuant to the Contract Clauses, but our analysis is incomplete without acknowledging the influence of this area of constitutional law on our precedent.

6. The United States Court of Appeals for the First Circuit also understood our decision in *Spiller* as a rejection of the alternative approach. *See Parker v. Wakelin*, 123 F.3d 1, 8 (1st Cir.1997).

[¶ 18] Our principal policy concern in *Spiller* was that an alternative holding would "unduly restrict the power of the legislature." *See* 627 A.2d at 517. We concluded our decision by stating: "Although one may conclude that it was unnecessary or even unwise for the legislature to have [made the statutory change at issue], it is not for this court to substitute its opinion on the merits or desirability of the legislation for that of the legislature." *Id.* (quotation marks omitted).

[¶ 19] Following this precedent, we must consider the 1991 language upon which the employees rely in light of the multiple amendments the Town made to its policy over the last twenty-one years in determining whether the Town ever clearly expressed an intent to create binding contractual rights. *See id.* at 516–17.

[¶ 20] In 1991, the Town's policy stated that retirees "shall continue as members of the town's group hospitalization plan, at the town's expense, to the same extent as current employees. . . . The town reserves the right to change this benefit in the future as circumstances require. Any such changes shall apply only to employees hired after August 8, 1991." Millinocket, Me., Personnel Policy § A128–17(D) (Oct. 25, 1991). That language, even when viewed alone, does not constitute "language expressing an intent to create [contractual] rights." *Spiller*, 627 A.2d at 517. In addition, the 1991 policy cannot be viewed in a vacuum. Every few years after it chose the particular turns of phrase on which the employees rely, the Town's legislative body amended its personnel policy and chose other language. This regularly occurring activity undermines the employees' position, and supports the Superior Court's determination that the 1991 language was nothing more or less than a declaration of a policy to be followed until the Town deemed that it

could no longer be pursued. Similarly, the 2009 decrease in payments was the result of the Town's determination that, despite its previously expressed wish to protect its retirees from increasing costs of health care, it could no longer do so.

[¶ 21] In *Spiller* we noted what we referred to as one of the "time honored rules of construction," that is, that "a statute will not be presumed to create contractual rights, binding future legislatures, unless the intent to do so is clearly stated." 627 A.2d at 515. Given our precedent, there is a strong presumption against interpreting legislative acts to create contractual rights. The Superior Court properly found that the employees have failed to overcome that presumption. Because no legislative enactment by the Town used express language to create contractual rights, the employees cannot prevail on their claim for breach of contract. We affirm the judgment of the Superior Court on that basis.

## B. Promissory Estoppel

[¶ 22] The employees argue that the trial court erred in granting a summary judgment to the Town on their alternative claim for relief based on promissory estoppel. We previously adopted the promissory estoppel doctrine, as later set forth in the Restatement (Second) of Contracts § 90(1) (1981), in our decision in *Chapman v. Bomann*:

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

381 A.2d 1123, 1127 (Me.1978). Despite the availability of estoppel as a remedy, "when a party seeks to estop the govern-

ment we have viewed the claim with caution." *Mrs. T. v. Comm'r of the Dep't of Health & Human Servs.*, 2012 ME 13, ¶ 10, 36 A.3d 888; *see also Trull Nursing Home, Inc. v. State Dep't of Human Servs.*, 461 A.2d 490, 499 n. 16 (Me.1983) ("Estoppel against the government should be carefully and sparingly applied, especially where application would have an adverse impact on the public fisc." (citation omitted) (quotation marks omitted)).

[¶ 23] The employees argue that some combination of oral statements by Town officials and the Town's continued payment of 100% of premiums until 2009 created a promise that the Town should be estopped from denying. The alleged promise is that the Town would continue making 100% payments in perpetuity. On the facts of this case, however, the statements and continued payments are insufficient, as a matter of law, to constitute a promise by the Town. Here, it is critical that we focus on whether there is evidence that either (1) the Town itself promised the claimed benefit, or (2) the Town somehow ratified the unauthorized promises made by one of the Town's agents or employees. *See Sirois v. Town of Frenchville*, 441 A.2d 291, 294 (Me.1982). Absent our careful scrutiny of this threshold inquiry, claims of promissory estoppel in this area could devolve into "a case-by-case analysis for virtually every individual claiming reliance." *See* Andrew C. Mackenzie, Case Note, *Spiller v. State: Determining the Nature of Public Employees' Rights To Their Pensions*, 46 Me. L.Rev. 355, 372 (1994).

■ [¶ 24] We consider first whether the Town itself made a promise through the actions or statements of the town manager or members of the Town Council. In *Sirois*, we noted that a single member of a board of selectmen "cannot bind a town to a contract unless his authority to act alone is proved or his actions subsequently ratified." 441 A.2d at 294. As here, the plaintiff in *Sirois* was opposing a motion for summary judgment. *See id.* We concluded that, unless the plaintiff raises a genuine issue of material fact as it relates to the authority of the town official or the ratification of a promise, summary judgment is appropriate. *Id.*

[¶ 25] Pursuant to the Town Charter, the town manager's duties and powers do not include approving or offering retirement group hospitalization insurance benefits, or any kind of employee benefit. Millinocket, Me., Town Charter § C302 (Dec. 25, 1993). Furthermore, with respect to any employees basing their promissory estoppel argument on statements made by a Town Council member, an individual Town Council member does not have the authority to unilaterally bind the Town Council as to matters of retirement benefits. Millinocket, Me., Town Charter §§ C203, C210 (Dec. 25, 1993). Therefore, the employees did not provide evidence that raises a genuine issue of material fact about the town manager's or the Town Council's authority to make such promises.

■ [¶ 26] Next, we consider whether there is evidence in the record supporting a determination that the Town could be "bound" to a promise made by one of its agents because the Town later ratified that promise. *Sirois*, 441 A.2d at 294. The Restatement (Third) of Agency discusses the law of ratification by governments. Section 4.01 states that ratification does not occur unless "the person ratifying has capacity as stated in § 4.04." Restatement (Third) of Agency § 4.01(3)(b) (2006). Section 4.04(1)(b) requires that, in order to have capacity to ratify, a person must have capacity to act as a principal, as defined in section 3.04. Section 3.04(2) states that "[t]he law applicable to a person that is not an individual governs whether the person has capacity to be a principal." Comment

d to section 3.04 explains that "[t]he legal capacity of a person that is not an individual is governed by the legal regime by virtue of which such person exists and functions." Thus, "the legally operative actions that may be taken by governments and subdivisions of governments are often specified by statute, constitution, or charter," and this "limits a governmental principal's capacity to authorize agents." *Id.* In summary, only a principal can ratify, and when a principal is a government, the government can only ratify through a legally operative action.

[¶ 27]  The Town is a government entity that can act only in a manner consistent with its authorizing document, the Town Charter.  There is no evidence that the authorization for the payments upon which the employees rely as part of their estoppel claim was given by the only body with the authority to do so, that is, the Town Council. *See Richmond v. Johnson,* 53 Me. 437, 438 (1866) (requiring ratification "by the board of selectmen or the town" before recognizing a contract signed by one of the selectmen).  Payments of premiums made by Town officials, when the Town had not promised to make such payments, cannot create a promise or effect estoppel because the officials are not authorized to make such a promise on behalf of the Town.

[¶ 28]  The employees failed to produce sufficient evidence to establish a prima facie case either that (1) the Town itself promised the claimed benefit, or (2) the Town somehow ratified the unauthorized promises made by one of the Town's agents or officials.  As a result, the employees' promissory estoppel claim must fail as a matter of law.

## C.  Unconstitutional Taking

[¶ 29]  The Takings Clause of the Maine Constitution provides, much like its federal counterpart: "Private property shall not be taken for public uses without just compensation; nor unless the public exigencies require it."  Art. I, § 21; *see also* U.S. Const. amends. V, XIV, § 1.  In order to fit within the confines of this protection, however, the employees would have to establish that they had a contractual right to the benefits they claim. *See Parella v. Ret. Bd. of the R.I. Emps.' Ret. Sys.,* 173 F.3d 46, 58–59 (1st Cir.1999).  Because we have determined that no such contractual right exists, the Town is entitled to summary judgment on this count of the employees' complaint and we affirm.

The entry is:

Judgment affirmed.

JABAR, J., dissenting.

[¶ 30]  I respectfully dissent.

[¶ 31]  Although I agree with the Court's conclusion that the language in this case does not rise to the level of an express contract as mandated in *Spiller v. State,* 627 A.2d 513, 515–17 (Me.1993), I do not agree that the employees failed to create a genuine issue of material fact regarding promissory estoppel.  In *Spiller,* the leading case involving legislation concerning retirement benefits for public employees, the Court left open the possibility that public employees could prove their claim to promised benefits through the concept of promissory estoppel. *Id.* at 517 n. 12. The *Spiller* Court indicated that retirement benefits are more than gratuities and in a footnote stated: "We have said that state employees have legitimate retirement expectations . . . . [and] the State may be estopped from changing certain benefit provisions in the retirement statutes." *Id.* The Court went further in the footnote to intimate, without expressly deciding, that changes to the retirement statute could implicate the doctrine of

promissory estoppel. *Id.* In support of the promissory estoppel theory, the Court cited a Minnesota case: *Christensen v. Minneapolis Municipal Employees Retirement Board,* 331 N.W.2d 740 (Minn.1983). *Spiller,* 627 A.2d at 517 n. 12.

[¶ 32] I believe that we should follow the approach taken by the Minnesota Supreme Court in *Christensen.* As that court stated, it is "realistic, fair[,] and practical . . . to judge the state's promise by the doctrine of promissory estoppel." *Christensen,* 331 N.W.2d at 748. The Minnesota court went on to state:

> In the realities of the modern employment marketplace, the state reasonably expects its promise of a retirement program to induce persons to accept and remain in public employment, and persons are so induced, and injustice can be avoided only by enforcement of that promise. Promissory estoppel, like equitable estoppel, may be applied against the state to the extent that justice requires.

*Id.* at 749.

[¶ 33] In *Christensen,* the plaintiff was a participant in the Minnesota Municipal Employees Retirement Fund, under the age of sixty, and receiving pension benefits. *Id.* at 742–43. At the time the plaintiff retired, the pension plan did not include a minimum age requirement for elected officials. *Id.* at 743–44. In 1980, Minnesota enacted a new requirement that imposed a minimum age for entitlement to benefits. *Id.* at 744. In April 1980, the plaintiff's monthly pension benefits were suspended until he reached the age of sixty because the new law imposed a minimum age requirement as a prerequisite to receiving pension benefits. *Id.* at 742–43. The Minnesota court held that Christensen had a protectable pension entitlement and the promise of a pension to be paid when

he retired was binding on the State. *Id.* at 749.

[¶ 34] The *Christensen* court said that in applying the doctrine of promissory estoppel, "two factors must be kept in mind: (1) What has been promised by the state? and (2) to what degree and to what aspects of the promise has there been reasonable reliance on the part of the employee?" *Id.* Applying the rationale and principles set out in *Christensen,* the facts present in this case create genuine issues of material fact regarding the Town's promise and the employees' reliance on that promise.

A. Promise

[¶ 35] The alleged promise at issue here is the Town's enactment of the 1991 personnel policy stating that retired town employees would receive the same health insurance benefits as current town employees, which at that time was 100% of current employees' health insurance costs. The 1991 policy also stated that this healthcare benefit was subject to change, *except for employees hired before August 8, 1991.* The employees argue that this provision singled out a specific class of employees and highlighted the Town's intention to "grandfather" these employees from any future changes in the policy. The evidence submitted by the employees supports this argument regarding the Town's intent.

[¶ 36] The employees submitted depositions of previous Town officials in support of their reading of the 1991 policy. The Town Manager at the time of the 1991 enactment, William Ayoob, stated that his understanding of the language in the 1991 personnel policy was that "[w]hatever the benefits were at the time, [the employees hired prior to August 8, 1991,] would be grandfathered, . . . the way I understood it." Ayoob also stated that grandfathering those employees meant that changes to the

policy would affect only employees hired on or after August 8, 1991. Similarly, a Town Council member at that time, Rodney Daigle, stated that "the people that were already working for [the Town], you know, prior to '91, we didn't want to involve them because we wanted to ... grandfather them ... we thought they shouldn't be subject to ... changes." Daigle clarified that he meant that employees hired before that 1991 date would not be governed by subsequent changes made to the 1991 policy.

[¶ 37] Finally, the Town's attorney at that time, Dean Beaupain, stated that the provision providing that future changes would not affect employees hired prior to August 8, 1991,

> was put in to serve two purposes, number one, to try and keep the faith with people who were currently working for the Town and had previously retired from the Town. This was a benefit the Town had offered over the years. We wanted to maintain that, but much more importantly it was to send a notice to future people hired by the Town ... that they should not expect a retiree benefit for health insurance when they retired.

[¶ 38] We have stated that the promise of a town official "cannot bind a town to a contract unless his authority to act alone is proved or his actions subsequently ratified." *Sirois v. Town of Frenchville*, 441 A.2d 291, 294 (Me.1982). In *Sirois*, a town selectman made a promise that he did not have authority to make and that was not ratified by the town. *Id.* at 293–94. Here, however, unlike in *Sirois*, we have more than just the statements and promises of town officials. The enactment by the Town Council of the 1991 personnel policy as well as the continued payment of the benefits enumerated in that policy by the Town for eighteen years constitutes official action taken by the Town.

[¶ 39] In *Otis v. Stockton*, this Court determined that a party seeking to bind a town to an alleged promise made in the absence of express authority on behalf of town officials "must ... affirmatively prove[ ] that the town [itself] has subsequently approved and ratified [the acts of the town officials]." 76 Me. 506, 507–08 (1884). The Court posited that whether a town ratified a promise is largely fact dependent and is to be decided on a case-by-case basis. *Id.* at 508–09. The Court stated:

> There must be something more than mere silence upon the part of the town to create an estoppel. *Of course, that fact in connection with other facts may become material.* There may be occasions when a town should act or speak, or when it does speak by the force of circumstances.... It would be difficult to formulate any general rule or definition of corporate ratification. It must largely depend upon the facts peculiar to the individual case.

*Id.* (emphasis added); *see also Mason v. City of Augusta*, 2007 ME 101, ¶ 30, 927 A.2d 1146 (noting that city council ratified an agreement by authorizing amendments to the agreement); *Sch. Admin. Dist. No. 3 v. Me. Sch. Dist. Comm'n*, 158 Me. 420, 425–28, 185 A.2d 744 (1962) (discussing ratification by municipalities); *Lincoln v. Stockton*, 75 Me. 141, 146 (1883) ("[Municipal] ratification may result from failure to disavow the unauthorized act of an agent."). In this case, the Town Council took official action in enacting the 1991 personnel policy and in approving budgets that included these benefits. These official actions of the Town Council satisfy the requirement that any promises made by the Town must be subsequently ratified.

[¶ 40]   The evidence submitted by the employees creates a genuine issue of material fact surrounding the Town's promise to those employees hired before August 8, 1991.

B.   Reasonable Reliance

[¶ 41]   The second factor to consider in applying the doctrine of promissory estoppel is whether there was reasonable reliance on the part of the employees, if in fact the Town made them a promise.   The employees submitted evidence indicating that they relied upon this alleged promise in making their decisions to work for the Town.

[¶ 42]   In their answers to interrogatories and testimony during deposition, some of the employees stated that they relied on the promise of health insurance for life in making the decision to stay with the Town instead of going to work at the local mill, where wages were higher.   Many of the employees also stated that they knowingly took lower pay increases in exchange for these health insurance benefits.   For summary judgment purposes, these statements create a genuine issue of material fact as it relates to the employees' reliance on the Town's alleged promise and whether this reliance was reasonable should be decided by a fact-finder, not by this Court as a matter of law.

[¶ 43]   There is also evidence that the Town paid 100% of the retired employees' health insurance costs from 1991 through 2009, a period of eighteen years, including the years following changes in the policy made by the Town in 1999, 2002, and 2006. The Court references these changes in the policy and asserts that this is evidence that the health insurance benefits for retirees established in the 1991 personnel policy were subject to change.   However, if in fact the Town intended to grandfather those employees hired before August 8, 1991, these changes were not applicable to them.   The Town's continued payment of 100% of retirees' health insurance premiums for eighteen years in spite of the multiple changes to the policy supports the employees' argument that the Town intended to grandfather employees hired before 1991 and that the changes in the policy in 1999, 2002, and 2006 did not apply to them.   This evidence establishes the reasonableness of the employees' reliance.

[¶ 44]   Whether the employees actually acted in reliance on the Town's promise as they assert and whether that reliance was reasonable are factual issues to be determined by the fact-finder.   As was said in *Christensen,* "[n]ot every promise in all its implications is necessarily enforceable under promissory estoppel." 331 N.W.2d at 749.   However, at the summary judgment stage we should not rule as a matter of law that the employees have not proved promissory estoppel.

[¶ 45]   The trial court's granting of summary judgment on the issue of promissory estoppel should be vacated.   The employees have raised genuine issues of material fact as to the doctrine of promissory estoppel.