Majority: GORMAN, JABAR, and HJELM, JJ.
Concurrence/Dissent: ALEXANDER, J.
Dissent: CLIFFORD, J.
JABAR, J.
[¶ 1] Elizabeth Brown appeals from the Superior Court’s (Penobscot County, Cud-dy, J.) entry of a summary judgment in favor of Delta Tau Delta (DTD) and Delta Tau Delta National Housing Corporation (DTDNHC) on' her claims' arising out of events that occurred at the fraternal organization’s Gamma Nu chapter[1] located bn the University of Maine’s Oroho campus (UMO). Brown argues that the court erred in concluding that neither DTD nor DTDNHC owed her a duty of' care sufficient to support her negligence claims, and in dismissing her claims seeking to hold DTD and DTDNHC vicariously liable. Because we conclude that DTD owed a duty to its collegiate chapters’ social invitees sufficient to support Brown’s claim based- on premises liability, we vacate that portion of the Nummary judgment. We affirm the summary judgment on the remaining claims against DTD. We also affirm and do not further discuss the summary judgment as to DTDNHC because there is nothing in the record suggesting that the property-holding corporation had a duty, based on premises liability or otherwise, to Gamma Nu’s social invitees.
I. BACKGROUND
[¶ 2] Viewed in the light most favorable to Brown, as the nonmoving party, the summary judgment record establishes the following facts. See Budge v. Town of Millinocket, 2012 ME 122, ¶ 12, 55 A.3d 484.
[¶ 3] On September 17, 2010, Gamma Nu hosted a party at its DTD fraternity house that was restricted to invited guests only. Brown, a UMO student, was invited to'the party by Joshua Clukey, a member of Gamma Nu. Brown arrived at the fraternity house between 11:00 and 11:30 p.m. and found Clukey. Brown and Clukey, who had both been drinking alcoholic -beverages, went upstairs to Clukey’s room, past a fraternity member whose function was to limit access to the upper floors to residents and their guests. Inside his room, Clukey sexually assaulted Brown and prevented her from leaving the room for several minutes.
[¶4] The day after the party, Brown reported the incident to the fraternity president, who told her “the fraternity had been concerned about Clukey for a while” because he had developed a drinking problem and had recently caused property damage and engaged in fights with other *791 fraternity brothers. The fraternity president reported the incident involving Brown to the chapter consultant, who is employed by the national fraternity, DTD. The following week, the local chapter expelled Clukey from the fraternity for engaging in conduct unbecoming a member and for violating the national fraternity’s code of conduct and rules regarding alcohol and hazing. Clukey was notified of his expulsion by letter from the national fraternity.
[¶ 5] On September 11, 2012, Brown filed a civil complaint against Clukey, DTD,[2] and DTDNHC.[3] DTDNHC is an Indiana non-profit corporation that holds property for DTD and leases the fraternity house to Gamma Nu. DTD is a national non-profit corporation organized in New York and doing business in Indiana; Gamma Nu is its local chapter at UMO. DTD’s purpose is to advance its mission and values by providing resources to local chapters and regulating them through risk management policies, a member code of conduct, and oversight by chapter consultants and alumni advisors. DTD’s constitution and by-laws set forth an intricate hierarchy of rules and regulations “to provide for the effective organization of [fraternity] operations 'on the international, division, and chapter levels,” including member initiation regulations, implementation of national Member Responsibility Guidelines (MRGs), and enforcement mechanisms.
[¶ 6] Brown’s initial complaint alleged counts of assault and false imprisonment against Clukey, and vicarious liability against both DTD and DTDNHC. Through subsequent amendments to hen complaint, Brown added counts of negligence, premises liability, and negligent infliction of emotional distress against Clu-key, DTD, and DTDNHC, and requested recovery of punitive damages from Clukey.
[¶ 7] In October 2013, Clukey was dismissed from the case with prejudice following Brown’s settlement of her claims against him. On January 29, 2014, the court granted DTD and DTDNHC’s motion to dismiss with respect to the issue of vicarious liability and denied the motion in all other respects. After entry of this order, Brown’s remaining counts against DTD and DTDNHC alleged negligence, négligent infliction of emotional distress, and premises liability. On March 17,2014, the court granted DTD and DTDNHC’s motion for summary judgment, concluding that neither DTD nor DTDNHC owed Brown a duty of care. Brown appeals.
II. DISCUSSION
[¶ 8] Because there is nothing in the record suggesting that Clukey was acting as an agent of DTD or DTDNHC at the time of the assault, we reject. Brown’s vicarious liability claims and focus only on her claims of negligence. We review de novo the court’s entry of summary judgment in favor of DTD based upon the legal determination that ,DTD did not owe Brown a duty of care. See Estate of Cabatit v. Canders, 2014 ME 133, ¶ 8, 105 A.3d 439.
A. Duty
[¶ 9] Even though the issue is fact driven, the question of duty is a legal question decided by the court, not the jury. *792 See Michaud v. Great N. Nekoosa Corp., 1998 ME 213, ¶ 15, 715 A.2d 955. Because it is a mixed question of law and fact, the facts in'any given case will determine whether an entity has a duty to the putative plaintiff. See Cameron v. Pepin, 610 A.2d 279, 282 (Me.1992). This is a multi-factored analysis that necessarily evokes policy-based considerations including the just allocation of loss. See id.
[¶ 10] The undisputed facts in this case do not give rise to a duty beyond that related to Brown’s premises liability claim. Specifically, the summary judgment record reveals no “special relationship” between Brown and DTD sufficient to sustain Brown’s general negligence claim, see DeCambra v. Carson, 2008 ME 127, ¶¶ 11-12, 953 A.2d 1163 (holding that, absent a special relationship, between the parties, “there is no general obligation to protect others from the actions of third parties, even where one knows the third party is or'could be dangerous”), nor does it reveal a special relationship or facts that would give riáe to bystander liability sufficient to support Brown’s negligent infliction of emotional distress claim, see Curtis v. Porter, 2001 ME 158, ¶¶ 18-19, 784 A.2d 18 (holding-that, except in bystander liability claims or when “a special relationship exists between the actor and the person emotionally harmed,” there is “no ... general duty to avoid negligently causing emotional harm to others”). However, as our discussion will illustrate, the facts here give rise to a question of duty founded on premises liability. The issue is thus whether, based on the factual record, the national fraternity has a duty to exercise reasonable care for the safety of its local chapter’s social invitees during functions sponsored by the local chapter and held at the DTD fraternity house.
[¶ 11] We have determined that a duty founded on premises liability exists between a university and its business invitees. Stanton v. Univ. of Me. Sys., 2001 ME 96, ¶¶ 8, 10, 773 A.2d 1045. In Stanton, a visiting student at the University of Southern Maine was sexually assaulted in her dormitory room. Id. ¶¶ 2-3. We held that, in light of the relationship between the University as the owner of the dormitory and the female student as its business invitee, as well as the foreseeability of a sexual assault occurring within a dormitory room, “the University owed a duty to reasonably warn and advise students of steps they could take to improve their personal ■ safety.” Id. ¶¶ 8-10; see also Schultz v. Gould Acad., 332 A.2d 368, 370 (Me.1975) (“Plaintiff, as a student attending the defendant Academy, had the legal status of a business invitee, to whom defendant’s employee owed a duty to exercise reasonable'care in taking such measures as were reasonably necessary for [the student’s] safety in light of all then existing circumstances.”)
[¶ 12] Though we have not previously addressed the question of ■& national fraternity’s duty to,its local chapter’s social invitees, courts in other jurisdictions condition the existence of a duty on the extent of the national fraternity’s control over the local chapter. In Grenier v. Comm’r of Transp., 306 Conn. 523, 51 A.3d 367, 373-74, 389 (2012), the Connecticut Supreme Court considered whether a national fraternity’s level of involvement with its local chapter was sufficient to give rise to a duty of care owed by the fraternity to a local member who suffered fatal injuries in an automobile accident while returning from a chapter event. Noting that different courts had reached different conclusions, the Grenier court held,
Ultimately, whether a national fraternity may be held liable for the actions of one of its local chapters depends both on its ability to exercise control over the local *793 chapter as well as its knowledge either that risk management policies aré not being followed or that the local chapter is engaging in inappropriate behavior.
Id. at 388. In reversing summary judgment entered in favor of the national fraternity, the court considered evidence that the fraternity provided financial resources to, imposed. risk management standards on, and maintained supervisory and enforcement authority over the local chapter. Id. at 389. It also considered evidence that the national fraternity conducted chapter leadership training and regulated member conduct through rules and regulations, including those related to the use of alcohol. Id.
[¶ 13] In Morrison v. Kappa Alpha Psi Fraternity, 738 So.2d 1105, 1118 (La.Ct.App.1999), the Louisiana Court of Appeal determined that a national fraternity owed a duty to protect a pledge from injuries caused during its local chapter’s hazing activities when the national organization was aware of prior hazing activities at that chapter. In that case, the national fraternity was “responsible for all that [went] on in its chapters, as it ha[d] the right to control intake, expel or suspend members, and revoke charters”; had officers and alumni advisors responsible for auditing and supervising local chapters’ compliance with fraternity rules; and had educational programs and workshops “to address the problem of hazing.” Id. But see Walker v. Phi Beta Sigma Fraternity, 706 So.2d 525, 529 (La.Ct.App.1997) (concluding that a national fraternity with no notice of hazing activities and no authority to control the day-to-day activities of a local chapter had no duty to protect a member from hazing injuries despite the national organization’s general anti-hazing policy).
[¶ 14] As these cases illustrate, the inquiry as to the existence of a duty is fact-intensive. Here, we look to general principles of duty, with particular emphasis on the undisputed facts relevant to foreseeability, control, and the relationship of the parties, in determining whether a duty founded on premises liability exists between DTD and its local chapter’s social invitees. See Stanton, 2001 ME 96, ¶ 8, 773 A.2d 1045; Hughes v. Beta Upsilon Bldg. Ass’n, 619 A.2d 525, 527 (Me.1993) (“[Duty] arises only from a relationship that society recognizes as sufficient to create the duty. Just as control and foreseeability are factors in a duty analysis, so is the relationship of the parties.”). For the following reasons, the facts in this case dictate our holding.
1. Foreseeability
[¶ 15] Over a decade ago, we recognized that sexual assaults could foresee-ably occur in a dormitory room on a college campus. Stanton, 2001 ME 96, ¶ 10, 773 A.2d 1045. Certainly, nothing has occurred during the past. fourteen years to make such events,less foreseeable. . It is similarly foreseeable that allowing a group of eighteen-to-twenty-year-olds control over a residence where alcohol-related parties are held presents the potential for misconduct, including sexual assault. A national fraternity knows, or should know, that social events carried on in a building that houses one of its local chapters presents the potential for sexual assault, particularly where alcohol consumption is an integral part of the event.
[¶ 16] The mechanisms through which DTD controls the behavior of its members, discussed below, demonstrate its' awareness of these potential problems. DTD’s “Policy on Alcohol and Substance Abuse,” which is integrated- into the MRGs, recognizes that the “well known dangers of alcohol and substance abuse” may.be manifested by “relationship problems, including *794 inappropriate sexual behavior [or] harassment.” The MRGs also state:
The Fraternity will not tolerate or condone any form of abusive behavior, including sexist or sexually abusive behavior, on the part of its members, whether physical, mental or emotional.... This is to include any actions, activities, or events, whether on chapter premises or an off-site location directed toward members or non-members or any actions which are demeaning to women or men.... Such behavior includes ... sexual assault.
[¶ 17] DTD’s policies recognize the self-evident potential for excessive drinking and sexual abuse within the fraternity setting. These policies would make little sense unless such activities were foreseeable. See Stanton, 2001 ME 96, ¶ 10, 773 A.2d 1045 (“That a sexual assault could occur in a dormitory room on a college campus is foreseeable and that fact is evidenced in part by the security measures that the University had implemented.”); Mullins v. Pine Manor Coll., 389 Mass. 47, 449 N.E.2d 331, 337 (1983).
2. Control
[¶ 18] The undisputed facts of this case demonstrate both DTD’s authority to control its members as well as its actual control. Through its constitution, by-laws, and administrative connection to its local chapters’ day-to-day activities, DTD exercises significant control over its individual members.
[¶ 19] DTD requires each local chapter to adopt local by-laws that do not conflict with the national constitution or by-laws. Local chapter by-laws are expected to address local risk management plans that supplement the national MRGs; implement DTD’s alcohol education program, Belts Talking About Alcohol; and require all members to sign the national code of conduct. Each chapter must provide a certified copy of its by-laws, and any amendments thereto, to the national central office.
[¶ 20] As part of the chapter accreditation process, the MRGs must be presented to the local chapters’ pledges and members by October 25 of each year. The MRGs set out the rules and regulations to which every member is expected to adhere. In addition to those provisions already discussed, they provide that:
9. Drunkenness by members and pledges will be classified as “conduct unbecoming a member of the Fraternity” as defined in ... the Fraternity’s Constitution.
10. Every chapter will implement the Fraternity’s primary alcohol education program....
11. No members ... shall purchase for, serve to, or sell alcohol beverages to any minor....
12. No member ... shall permit, tolerate, encourage or participate in “drinking games.”
The MRGs also set out specific rules and regulations pertaining to conduct by its members at social events held by the local chapter.
[¶21] The national code of conduct, which DTD requires each of its members to sign, sets out the behavioral standards to which every member is expected to conform. The code requires members to refrain from sexual abuse and the abuse of alcohol, and also prohibits physical or psychological hazing and the use of illegal drugs. DTD requires each chapter president to, among other things, enforce compliance with the code of conduct and DTD’s rules and regulations.
[¶ 22] DTD’s constitution also provides that each local chapter shall have an alumni advisor, who acts within the local chap *795 ter as a deputy for the Arch Chapter, which is the national organization’s governing body. The chapter advisor’s duties include overseeing and advising the,local chapter to ensure compliance with the rules, and guidelines set forth by the national organization and reporting back to DTD regarding the chapter’s activities. In addition, a chapter consultant visits each local chapter at least once per semester. Chapter consultants meet with local fraternity leadership and alumni advisors, inquire into chapter operations, provide feedback for improvements, and report back to DTD’s central office. These consultants also report potential violations of DTD rules by the local chapters to their supervisors at DTD, who then investigate the infractions and sanction the chapter as necessary.
[¶ 23] DTD also has a comprehensive process for disciplining members who violate its rules or regulations. The MRG enforcement criteria designate three categories of MRG violations of increasing severity. All incidents of misconduct must be reported to the national office, and- a member charged with an infraction has due process rights to notice and a hearing, which necessarily run through the Arch Chapter. DTD has broad authority to impose sanctions, which may include mandating educational workshops, imposing fines, conducting membership review, revoking a chapter’s privilege to hold events with alcohol, revoking a chapter’s charter, or Suspending or expelling individual members. In short, the national fraternity does more than simply suggest that its members conform to certain norms; it enforces its rules, regulations, and codes of conduct through constant monitoring, oversight, and intervention.
3. Relationship
[¶24] The same elements by which DTD controls its members — its chain of command, its articulation and imposition of its code of conduct, ■ and its process for disciplining members who do not comply ■with its rules — also establish a close relationship between, the national fraternity and its local chapters and individual members. DTD -imposes a complex hierarchy of rules and regulations upon its local chapters and individual members, and its constitution sets out a clear- command structure to which, local chapters must adhere.
[¶ 25] In addition to the alumni representatives that the national fraternity requires within each chapter, the national chain of command provides for a chapter advisor whose full-time job is to monitor and provide oversight of the functioning of the local chapter, to “assist the undergraduate chapter in understanding and living the Mission and Values of the Fraternity,” and to report to DTD on a regular basis. The DTD constitution provides thát the division president, an officer of the national fraternity, appoints these advisors, as well as the assistant chapter advisors. These constitutional officers provide a direct link between the national fraternity and each local chapter.
[¶ 26] Through its comprehensive articles and clearly defined power structure, DTD expressly reaches into the day-to-day affairs of its local chapters and creates a close, mutually beneficial relationship with its individual members.
B. Conclusion
[¶ 27] We conclude that the foreseeability, control, and relationship factors present here are sufficient to impose upon DTD a duty founded on premises liability. See Stanton, 2001 ME 96, ¶¶ 8, 10, 773 A.2d 1045. This ease involves the responsibility of a national organization, DTD, which provided its name, its credibility, its *796 corporate structure, and its code of conduct to a local branch on a college campus. DTD effectively handed over a residential building to a group of college students, and in doing so it-should have anticipated that alcohol-related parties on the premises would follow, as could the social problems that accompany such activities. It; therefore had a duty to exercise reasonable care in providing a reasonably safe environment for any social invitee to an event at the fraternity house. Imposing upon a national fraternity that integrates itself into its local chapter and onto a college campus a duty to take reasonable steps to protect the safety of social invitees at its fraternity house is no more onerous'or unexpected than the duty so'ciety imposes upon a university to exercise cáre in the administration of its dormitories.
[¶ 28] DTD had the, authority to control its individual members, and actually did so through implementation and enforcement of its rules and .regulations. DTD also had a close, integrated relationship with Gamma Nu, as demonstrated.by DTD’s- corporate structure. Finally, it is certainly foreseeable that turning a fraternity house over to college students, where parties and alcohol-related events are likely to occur, creates the potential for sexual misconduct — a known safety issue on college campuses.
. [¶29] We conclude that DTD had a duty to exercise reasonable care and take reasonable steps to provide premises that are' reasonably safe and reasonably free from the potential of sexual misconduct by its members, for all social invitees to chapter-sponsored events. Our finding of a duty does not establish-any liability on the part of DTD. Brown still has the obligation to convince a fact-finder that there was a breach of that duty, and that the breach was the cause of her injuries. -
The entry is:
Dismissal of vicarious liability claims affirmed. Summary judgment in favor of Delta Tau Delta on the premises liability claim vacated; summary judgment on the remaining counts affirmed. Summary judgment in favor of Delta Tau Delta Housing Corporation affirmed. Remanded for further proceedings consistent with this opinion.

. Because the fraternity’s local chapter is an unincorporated association of undergraduate students, it is not susceptible to being sued in its own name, though its individual members are amenable to suit for their individual negligent conduct. See K & S Servs., Inc. v. Schulz Elec. Grp. of Cos., 670 F.Supp.2d 91, 93 (D.Me.2009); Tisdale v. Rawson, 2003 ME 68, ¶ 15, 822 A.2d 1136; Libby v. Perry, 311 A.2d 527, 534 (Me.1973).

. According to DTD, it was inaccurately named in the complaint; its name is actually Delta Tau Delta Fraternity, Inc.

. DTDNHC was substituted as a defendant for Delta Tau Delta Building Corp. (DTDBC), which was named in the original complaint, DTDBC is a now-defunct Maine non-profit corporation that leased property to Gamma Nu in Orono in the 1990s, but sold the property to DTDNHC in 1998.